Submitted February 26, reversed and remanded November 18, 2009

JOHN BAPTISTE CASTRO,
*Petitioner,*

*v.*

BOARD OF PAROLE
AND POST-PRISON SUPERVISION,
*Respondent.*

Board of Parole and Post-Prison Supervision
A133355

220 P3d 772

Peter Gartlan, Chief Defender, and Marc D. Brown, Deputy Public Defender, Legal Services Division, Office of

Public Defense Services, filed the brief for petitioner. John Baptiste Castro filed the supplemental brief *pro se*.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Ryan Kahn, Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Deits, Senior Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Petitioner is serving a life sentence for felony murder. His first parole eligibility date was February 2006. After an "exit interview" in August 2005, the Board of Parole and Post-Prison Supervision (board) postponed his parole release date for two years. Petitioner sought administrative review, which was denied. He now seeks judicial review, arguing (among other things) that the board's order is not supported by substantial evidence. ORS 144.335(3); ORS 183.482(8). We agree. We therefore reverse and remand.

In 1977, at the age of 25, petitioner murdered his stepfather, apparently at the instigation of his mother. He was not apprehended for 13 years. In the interim, he was convicted of four crimes, none involving violence. When apprehended for the murder, he confessed to the crime and was convicted of felony murder, receiving a sentence of life in prison. At the time, the Multnomah County Deputy District Attorney who prosecuted petitioner recommended to the board that, despite petitioner's extensive criminal history, he should be released after serving only 12 years. The prosecutor cited several mitigating factors, including that petitioner had accepted responsibility prior to his arrest, had voluntarily confessed 13 years after committing the offense, had stipulated to the facts of the case, had waived his right to a jury trial, and had committed the offense at the instigation of his mother. The prosecutor also noted that the victim's family did not object to the recommendation. The judge who conducted the trial joined in the recommendation. *See generally Castro v. Maass*, 139 Or App 69, 71, 910 P2d 1156 (1996) (explaining petitioner's sentence). The board set petitioner's parole release date for February 27, 2006, thus establishing a minimum incarceration period of 15 1/2 years.

In August 2005, the board held an exit interview with petitioner as authorized under ORS 144.125(1).[1] The

---

[1] ORS 144.125(1) provides, in part:

"Prior to the scheduled release of any prisoner on parole * * * the [board] may upon request of the Department of Corrections or on its own initiative interview the prisoner to review the prisoner's parole plan and psychiatric or psychological report, if any, and the record of the prisoner's conduct during confinement."

record shows (and the board does not dispute) that, at the time of the interview and for at least the immediately preceding 11 years, petitioner had been an exemplary inmate. At the interview, in response to questions regarding his motivation in committing the offense, petitioner stated that his "main" motivation had been financial: his mother had promised to pay a debt that petitioner owed in exchange for him killing the victim. Petitioner also cited as motivation his "drug-induced state of mind" and his mother's statement to him that the victim had sexually molested his sisters. In the letter he submitted to the board for use at the interview, petitioner wrote, "I allowed my [m]other to tell me that [the victim] had done something wrong, and that I could eliminate the financial problems I had by committing this crime. In a drug induced state of mind I agreed[.]" In that letter, he also expressed remorse and extended an apology to the victim and to the victim's family, writing, "It took me many years before I was able to stand up and take full responsibility for what I've done and today I realize the harm I've done. At no time do I ever want to minimize the seriousness of this crime."

Petitioner's letter to the board, no part of which is disputed by the board, also outlined his completion of various programs (drug and alcohol treatment, anger management, "Breaking Barriers," "Pathfinders," conflict resolution training); involvement with Alcoholics Anonymous and Narcotics Anonymous; participation in community outreach organizations, one of which he cofounded (Los Hermanos, a public safety and crime prevention project for adjudicated and "high-risk" youth); and membership in several Oregon State Penitentiary (OSP) clubs and organizations (Chicano Culture Club, 7 Step Foundation, Athletic Club, Lifers Club, Wish Program).

The board also considered several letters in support of petitioner's release, including those from the executive director of Los Hermanos; two Western Oregon University professors with whom petitioner had worked to develop, among other things, a program of English instruction for Spanish-speaking inmates; a drunk-driving accident survivor who had shared his story several times with OSP's Chicano Culture Club, of which petitioner was president from 1997 to 2002; the Western Prison Project's executive

director, who had met petitioner through his involvement in several OSP organizations and recovery groups; petitioner's wife, who is an employee of a state agency (Adult and Family Services) and who owns a home in Salem; and petitioner's own psychologist at OSP, with whom petitioner had worked for eight years. Those letters described petitioner as a "leader" and "positive role model" for other prisoners and agree that he had successfully engaged the resources available to him at OSP to "not only change his former behavior, but also to make a positive contribution to society while still an inmate." (Letter of Dr. Maureen Dolan, Professor of Sociology, Western Oregon University.)

The materials before the board indicated that petitioner would have significant support in achieving his goals upon release. Bridgeway, a substance abuse rehabilitation center in Salem, expressed its willingness to work with petitioner to provide "[w]hatever alcohol and drug treatment services" were necessary, including a relapse prevention program. The two college professors with whom petitioner had worked offered to serve as his academic advisors. Los Hermanos offered petitioner a full-time job. And petitioner's wife expressed her intent to encourage and support petitioner in maintaining his sobriety and to provide him with health insurance through her employment.

Petitioner's psychologist at OSP, Rex M. Newton, Ph.D., with whom, as noted, petitioner had worked for eight years, stated that petitioner "has consistently worked to learn and improve himself for as long as [he has] known [petitioner]" and that petitioner "has taken every program available to him" at OSP. He also pointed out that petitioner "has a support system in the community, that includes professional opportunities to continue to work i[n] assisting others[, a] skill he has honed at OSP."

Petitioner informed the board that, when released, he planned to reside in Salem with his wife. According to petitioner, his goals upon release included obtaining employment as a barber, a position that he had held at OSP since 1996 and for which he was licensed through OSP's Vocational

Training Program; becoming a drug and alcohol counselor; obtaining U. S. citizenship; and maintaining his sobriety, which he had successfully done since September 16, 1994.

The only evidence in the record that conveys any-thing negative about petitioner is a psychological evaluation conducted by a board-appointed psychologist (not, as noted, the prison psychologist, whose evaluation was positive). The record contains no information about the board-appointed psychologist's experience or qualifications, except that his letterhead identifies him as a Ph.D. (granting institu-tion, date, and discipline undisclosed) and "Diplomate, Inter-Regional Society of Jungian Analysts." His evaluation was based on a review of petitioner's Corrections Division file, a "clinical interview" that, according to petitioner's unre-butted recollection, lasted 15 minutes, and the results of three written evaluative instruments (the Minnesota Multiphasic Personality Inventory-II, Million Clinical Multiaxial Inventory-II, and the Shipley Institute of Living Scale written tests), none of which are described.

The board-appointed psychologist's evaluation is damning. He states that, during the interview, petitioner paid "lip service" to, but did not "genuinely accept responsi-bility for," his criminal conduct. Instead, according to the psy-chologist, petitioner "seemed to minimize the seriousness of the offenses, tended to not report the essential ingredients or aspects of his criminal activities, and in general, attempted to portray himself in a positive light." The psychologist noted, in support of those characterizations, that petitioner, in explaining why he had killed the victim, omitted any refer-ence to a financial incentive, instead stating that his mother had convinced him to kill the victim by telling him that the victim had sexually molested his sisters. When petitioner was asked at his interview before the board to explain that omission, he responded that the interview had been termi-nated before he had an opportunity to do so.

In his "Summary and Conclusions," the board's psy-chologist stated that, although petitioner "has made a very positive adaptation within [OSP] and has participated in

many appropriate treatment programs," he "has not changed his deep-seated or basic characterological issues which would result in him acting-out in the future." He noted that petitioner, in the past, had suffered from a "very serious drug addiction" and had been "unable to conform to probation and parole expectations when in the community." (In fact, petitioner's parole was revoked once in 1972 and his probation was revoked once in 1979; in the period between the murder of his stepfather and his current incarceration, he served one probationary sentence without revocation and was paroled three times without revocation.) The psychologist diagnosed petitioner with Antisocial Personality Disorder, stating that petitioner "appears to be an individual whom one could not trust": "In spite of his compliance with treatment programs within the institution and his pleasant and charming persona, beneath the surface he is an individual whom one should not trust at the present time." He suggested that petitioner had yet to take "personal, deep-seated, or accurate responsibility" for his criminal conduct, noting that petitioner "makes excuses and tends to blame others or circumstances in spite of his expressed and perhaps even ingenuous statements of remorse." He ultimately opined, "[T]he results of the present psychological evaluation indicate that [petitioner] is a significant threat to the safety of the community."

Petitioner's interview with the board lasted less than an hour.[2] Other than petitioner, the only person to testify was the victim's widow. When the interview ended, the board went into recess; when the members returned to the interview room, they announced that they had decided to defer petitioner's release date until February 16, 2008, contingent on a satisfactory exit interview and then-current psychological evaluation.[3] Subsequently, the board issued a Board Action Form relating the date of the hearing, listing the board members and others in attendance, and containing the following explanation of its actions:

_____

[2] Although the transcript does not state the beginning or ending time, it consists of 24 double-spaced pages in 12-point type.

[3] Neither party has submitted any information indicating that this case has become moot. ORAP 8.45 (duty to inform court of facts rendering appeal moot).

"THE RECORD INDICATES THAT THE OFFENDER COMMITTED HIS/HER CRIME(S) PRIOR TO 5/19/1988.

"THE BOARD HAS RECEIVED A PSYCHOLOGICAL EVALUATION ON INMATE DATED 6/26/2005.

"BASED ON THE DOCTOR'S REPORT AND DIAGNOSIS, COUPLED WITH ALL THE INFORMATION THAT THE BOARD IS CONSIDERING, AND APPLYING OAR 254-50-015 (1977); ORS 144.180 AND PURSUANT TO ORS 144.175 (1) (2), THE BOARD DEFERS RELEASE DATE FOR 24 MONTHS FOR A PROJECTED PAROLE RELEASE DATE OF 02/16/2008, FOR A TOTAL OF 216 MONTHS. A REVIEW WILL BE SCHEDULED IN 8/2007 WITH A CURRENT PSYCHOLOGICAL EVALUATION."

The statutory and rule references indicate that the board's decision was based on findings that there was "a reasonable probability that [he would] not, after parole, remain outside the institution without violating the law and that his release [was] incompatible with the welfare of society," ORS 144.175(1), *repealed by* Or Laws 1977, ch 372, § 18, and that there was a "substantial risk that he [would] not conform to the conditions of parole," *former* ORS 144.175(2), *repealed by* Or Laws 1977, ch 372, § 18. Petitioner sought administrative review but was denied relief. In fact, the board's "Administrative Review Response" does not even acknowledge that petitioner questioned the evidentiary foundation of its order, despite the assertion in his *pro se* request for administrative review that the board's action was not adequately supported by the evidentiary record. He now seeks judicial review.

ORS 144.335(1) provides that a person over whom the board has exercised its jurisdiction and who has been adversely affected or aggrieved by a final order of the board may seek judicial review by this court. ORS 144.335(3) further provides that, on review, this court "may affirm, reverse or remand the order on the same basis as provided in ORS 183.482(8)." ORS 183.482(8), in turn, provides:

"(a)  The court may affirm, reverse or remand the order.

"* * * * *

"(c)  The court shall set aside or remand the order if the court finds that the order is not supported by substantial

evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

Substantial evidence review, while not authorizing us to substitute our judgment for that of agency decision-makers, requires us to take into account whatever evidence detracts from the weight of the evidence that supports the agency order. *Younger v. City of Portland*, 305 Or 346, 354, 752 P2d 262 (1988); *Garcia v. SAIF*, 187 Or App 51, 57, 66 P3d 522 (2003). ORS 183.482(8) also requires that the board provide "some kind of an explanation connecting the facts of the case (which would include the facts found, if any) and the result reached." *Martin v. Board of Parole*, 327 Or 147, 157, 957 P2d 1210 (1998); *Weems v. Board of Parole*, 221 Or App 70, 74, 190 P3d 381 (2008), *rev allowed*, 346 Or 115 (2009).

On judicial review, petitioner argues, among other things,[4] that the board's order is not supported by substantial evidence. That claim might have either of two meanings. It might mean that the undisputed historical facts (what petitioner did; what various evaluators wrote about petitioner), viewed as a whole, are such that a reasonable person could not infer that petitioner, if released, probably would violate the law and be a threat to society. That is a substantial *evidence* argument. The claim might also mean that the board's order does not adequately explain the logical connection between the evidence in the record and its conclusion that petitioner's release must be postponed. That is a substantial *reason* argument. As the court in *Martin* held, and as this case demonstrates, the two arguments both assert a lack of "substantial evidence" as that term is used in ORS 183.484(8);[5] *see also Salosha, Inc. v. Lane County*, 201 Or App

---

[4] Petitioner argues that, to the extent that the board relied on factors that cannot be changed in the future (such as, for example, the nature of his crimes), the order violates his rights under the Due Process Clause and exceeds the board's statutory authority by imposing the equivalent of a sentence of life without the possibility of parole. Because we are unable to determine whether, and to what extent, the board relied on such factors, we cannot and do not address that argument.

We reject petitioner's other arguments without discussion.

[5] The court in *Martin*, 327 Or at 156, explained, "The real issue * * * is whether the court's authority under ORS 183.482(8) extends to requiring that agencies like the Board provide explanations in their opinions that connect their choice of action with the facts of the case."

138, 143, 117 P3d 1047 (2005) ("Where a petitioner argues that an order is not supported by substantial evidence, a court will also review the order for substantial reason[.]").

The board argues that, in a case in which expert opinions have been offered on both sides of an issue, it is usually clear that a factfinder has found one or the other more persuasive, and substantial evidence and reason will exist to support the finding, without further explanation. *Armstrong v. Asten-Hill Co.*, 90 Or App 200, 206, 752 P2d 312 (1988). According to the board, this is such a case. An expert found that, although petitioner has been a model prisoner, he still has "deep-seated or basic characterological issues which would result in him acting-out in the future" and is an "individual whom one could not trust"; therefore, the expert concludes, petitioner "is a significant threat to the safety of the community." The board's legal conclusions that petitioner would probably violate his parole, violate the law, and be a threat to the welfare of society simply adopt the findings of the expert, and are therefore, under the *Armstrong* standard, adequate.

■ *Armstrong*, however, also teaches that substantial reason does not exist "when the credible evidence apparently weighs overwhelmingly in favor of one finding and the [b]oard finds the other without giving a persuasive explanation." *Id.* at 206. According to petitioner, this is such a case. He argues that the record contains abundant evidence that, for at least the last 11 years, his objectively verifiable actions have been indicative of his rehabilitation, that he has taken advantage of every opportunity that the institution offers to improve himself, and that he has reached out to other inmates and to the larger community. Further, he notes the glowing testimonials from many people—his prison therapist for eight years, community organizers, academics, and family. And finally, he claims to feel genuine remorse for his actions—a claim that, even at the time of his sentencing, the state's prosecutor believed. Contrary to those facts in the record, he notes, there stands only a four-page evaluation, prepared by a psychologist whose qualifications (other than being a Ph.D. and a certified Jungian) are not disclosed, based on a 15-minute interview, "review of the Corrections

Division [f]ile," and the reported results of objective evaluative instruments whose reputation for accuracy—indeed, whose reputation for appropriateness as predictive, as opposed to diagnostic, instruments—also remains undisclosed. The essence of this psychological evaluation is that, at least since confessing to his crime, petitioner has successfully perpetrated a fraud on the world—including the man who prosecuted him, the judge who oversaw his trial, the woman who married him, the community members who worked with him, and the psychologist who had an eight-year therapeutic relationship with him—by *pretending* to have become a person who is genuinely remorseful and sincerely dedicated to improving himself and others. In sum, petitioner argues that, by his conduct since his incarceration, he has exceeded every requirement that the court and the board imposed on him as a condition for release, yet the board has nonetheless denied release—based on one psychological report that, according to petitioner, is of dubious questionable validity. He reminds us that, although substantial evidence review is not an occasion for us to reweigh the evidence, it is nonetheless

> "a safeguard for anyone faced with the possibility of adverse consequences from a decision of an administrative agency. The [substantial evidence] rule loses its meaning if it is interpreted as leaving to the 'expertise' of agency personnel, rather than to the external scrutiny of appellate courts, the critical question whether the facts of the case permit the administrative choice involved."

*Drew v. PSRB*, 322 Or 491, 499, 909 P2d 1211 (1996).

Without necessarily agreeing with petitioner's characterization of the record, we nonetheless agree with him that this case falls into the category that, under *Armstrong*, requires the board to demonstrate its reasoning. We do not mean to imply that the board could not write an order that is supported by substantial evidence, including substantial reason. So far, however, the board has provided only a conclusion: "Based on the doctor's report and diagnosis, coupled with all the information that the board is considering," it is reasonably probable that petitioner would violate his parole or a law, and his release is incompatible with the welfare of society. That is an announcement, not an explanation. It gives us nothing to judicially review. Our duty is to evaluate

the board's logic, not to supply it. *Drew*, 322 Or at 499-500 (review for substantial reason is based on the order itself, not our independent review of the record). We must therefore reverse and remand. ORS 183.482(8); *Martin*, 327 Or at 157.

Reversed and remanded.