Submitted April 10, reversed and remanded June 13, 2012

KEVIN RICHARD KNOTTS,
*Petitioner,*

*v.*

PSYCHIATRIC SECURITY REVIEW BOARD,
*Respondent.*

Psychiatric Security Review Board
092449; A145460

280 P3d 1030

Harris S. Matarazzo filed the brief for petitioner.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Janet A. Klapstein, Senior Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

Petitioner seeks judicial review of an order of the Psychiatric Security Review Board (the board) committing him to the Oregon State Hospital (OSH), rather than conditionally releasing him, as he had requested. Because the board's order does not adequately explain the board's reasoning, we reverse and remand.

We begin with the facts, which we take from the undisputed evidence in the record. Petitioner was charged with several crimes for making unwanted contact with four young women at Oregon State University (OSU) on the afternoon of May 27, 2009. At the time of the charged crimes, petitioner was a junior at OSU, and his mental health had been deteriorating for months. He was depressed and had been isolating himself from family and friends. He also had been neglecting his studies and personal hygiene. And, as petitioner later told his family and doctors, he had been hearing voices.

Around 12:00 p.m. on the day of the charged crimes, petitioner approached a young woman, K. He grabbed her buttocks and said, "Oh, you're sexy." Then he walked away. Based on his conduct toward K, petitioner was charged with sexual abuse in the third degree, ORS 163.415.

Around 2:15 p.m., petitioner approached another young woman, H, and asked to borrow her mobile phone. He told her that he had left his phone in his car and needed to call it. H followed petitioner to where he said his car was parked, and she became suspicious because he was "mumbling" and "not making sense." She walked away and called campus security. Based on his conduct toward H, petitioner was charged with attempted kidnapping in the second degree, ORS 161.405; ORS 163.225.

Around 3:30 p.m., petitioner approached a third young woman, S, and grabbed her buttocks. In response, she turned and hit him in the chest. He asked if he could pay her for oral sex. He was "rambling," and she "did not understand what he was trying to say." She told him, "You need to get away from me," and he walked away. She called the police. Based on his conduct toward S, petitioner was charged with

sexual abuse in the third degree, ORS 163.415, and prostitution, ORS 167.007.

Also around 3:30 p.m., petitioner approached a fourth young woman, A, and grabbed her buttocks and shoulder. She kicked him, and he grabbed her arm and tried to pull her down a driveway, saying "Come here, it's okay." She kicked him again and said, "What is wrong with you? Get away." He ran away, and she called the police. Based on his conduct toward A, petitioner was charged with sexual abuse in the first degree, ORS 163.427, and attempted kidnapping in the second degree, ORS 161.405; ORS 163.225.

Around 3:45 p.m., petitioner was arrested and interviewed by the police. One police officer reported that petitioner was "very nervous and fidgeted with his clothes and hands[,] * * * paced a short distance side to side[,] or would turn his body back and forth restlessly." Another officer reported that "it was evident [that petitioner] was struggling with things in his head" when he was being interviewed.

After petitioner was arrested, his parents came to Oregon to move him back home to California. They discovered that his life had become "completely disorganized"; his apartment was uncharacteristically "messy," his phone and computer were "non-functional," and he had "hundreds of small notes stuffed in his backpack." After petitioner moved home, his parents observed him scribble unintelligible notes and talk to himself. They also noticed that his cognitive functioning was impaired; he could not do simple math or understand what he read. And, although petitioner had previously been "meticulous" about his appearance and hygiene, he was "heedless of both."

In June 2009, petitioner was evaluated by Dr. Colistro, a forensic psychologist. The evaluation was conducted in connection with petitioner's criminal charges. The purpose of the evaluation was to determine whether, at the time of the OSU incidents, petitioner had a "mental disease or defect" that caused him to "lack[ ] substantial capacity either to appreciate the criminality of [his] conduct or conform [his] conduct to the requirements of law," in which case he could be found "guilty except for insanity." ORS 161.295(1). Colistro diagnosed petitioner with "Depression Severe with Psychotic

Features." According to Colistro, petitioner's symptoms included "marked cognitive impairment, social isolation, uncharacteristic inattention to hygiene and grooming, psychomotor retardation, and bizarre behavior suggestive of delusional thinking." Colistro concluded that "it is reasonable to conclude that, at the time of [the alleged crimes], [petitioner] was unable to understand the wrongfulness of his conduct or to conform it to the requirements of law." Colistro further concluded that petitioner was a "good candidate for counseling and medical management of his condition" and should continue to live with his parents because he was responding well to being with them in California and receiving mental health treatment there.

In California, petitioner engaged in treatment supervised by Dr. Jerry Gelbart, a psychiatrist. Like Colistro, Gelbart diagnosed petitioner with "Major Depression with Psychotic Features." Gelbart prescribed antidepressant and antipsychotic medications to petitioner, who took them as directed. From June 2009 to August 2009, petitioner participated in an intensive hospital-based treatment program. Patients in the program spent their days at the hospital, participating in individual and group therapy intended to stabilize them and prepare them for further treatment. After completion of the hospital-based program, petitioner continued to participate in individual therapy with Dr. Gelbart, and he began group therapy with Michael Gelbart, Dr. Gelbart's brother and a licensed clinical social worker. Petitioner also attended community college and performed volunteer work on a weekly basis. According to Dr. Gelbart, the medications, therapy, family support, and participation in regular, structured activities improved petitioner's mental health, and petitioner's prognosis was "excellent."

In November 2009, petitioner returned to Oregon for resolution of the criminal charges against him. Pursuant to a stipulated agreement, the trial court found petitioner guilty except for insanity of attempted kidnapping in the second degree, and the state dismissed the remaining charges. The trial court placed petitioner under the jurisdiction of the board for a period of five years and committed him to OSH. *See* ORS 161.327(5) (prescribing procedure to be followed when a defendant has been found guilty except for insanity).

While at OSH, petitioner was treated by Dr. Passmore, a psychiatrist. Like Colistro and Dr. Gelbart, Passmore diagnosed petitioner with "depression with psychotic features," and he agreed that petitioner was psychotic during the OSU incidents. Passmore also noted that petitioner admitted to using alcohol and marijuana, and, in Passmore's opinion, petitioner's marijuana use probably exacerbated petitioner's mental health problems. However, by the time that petitioner arrived at OSH, his diagnosed condition was in remission. According to Passmore, petitioner was "without symptoms" and "psychiatrically stable" at OSH; he was "compliant," "engageable," and sought to "do more than what [was] available to him."

While at OSH, petitioner was evaluated by Dr. Walker, a psychologist. In January 2010, Walker conducted a "sex offender and violence risk assessment" of petitioner, administering two assessment instruments. Walker reported that it was "apparent [that petitioner] was in a floridly psychotic state at the time of his offense and his mental illness did in fact play a role in his actions." Walker also reported that, based on petitioner's history and test results, petitioner presented a "low risk for sexually acting out and low risk for future violence as long as he is stabilized on medication in a supportive environment and free of drug and alcohol use."

In February 2010, the board held petitioner's "initial hearing," as required by ORS 161.341(6)(a), to determine whether petitioner should be continued in his commitment, conditionally released, or discharged. At an initial hearing, the state bears the burden of proving that a patient continues to be affected by a mental disease or defect and is a substantial danger to others. ORS 161.327(1)(b); OAR 859-050-0055(1). A patient seeking conditional release at an initial hearing bears the burden of proving that he or she can be "adequately controlled and given proper care and treatment" in the community. ORS 161.341(3)-(4); OAR 859-050-0055(4). In this case, petitioner stipulated that he suffered from a mental disease or defect that, when active, rendered him a substantial danger to others, but he requested that the board conditionally release him.

OSH submitted a conditional release plan on petitioner's behalf, under which petitioner would return to California to live with his parents and participate in mental health treatment, including medication supervision and individual therapy with Dr. Gelbart and group therapy with Michael Gelbart, who would be petitioner's conditional release supervisor. In addition, petitioner would attend two self-help groups, Alcoholics Anonymous and Marijuana Anonymous, each week and be tested for alcohol and drug use twice a month.

At the hearing, Dr. Gelbart and Passmore testified in support of petitioner's conditional release plan. They detailed how petitioner had been successful while living in California and at OSH, and they stated that petitioner could be adequately treated and supervised in the community under the proposed conditional release plan. In addition to testimony, the board received exhibits, including the police reports regarding the OSU incidents, Colistro's report, petitioner's OSH records, Walker's evaluation, and a letter from Michael Gelbart, which, like the testimony of Dr. Gelbart and Passmore, supported petitioner's conditional release.

In his letter to the board, Michael Gelbart wrote that as petitioner's conditional release supervisor, he would ensure coordination of the conditional release plan and make monthly reports to the board regarding petitioner's progress. He also stated that, if petitioner violated the terms of the conditional release plan, then he would report that to the board. Dr. Gelbert testified that, although Michael Gelbart would be the board's primary contact person, he would be willing to make reports to the board as well. Additionally, Dr. Gelbart testified that, if he thought that petitioner was a danger to himself or others, then he would hospitalize petitioner in California and immediately report it to the board. And petitioner's father, a physician, testified that he would cooperate with the board to return petitioner to Oregon if the board revoked petitioner's conditional release. Petitioner himself agreed to waive extradition to Oregon if the board conditionally released him to California.

No one testified against petitioner's conditional release plan, and the state took "no position * * * on the propriety of a conditional release, even the propriety of a conditional release to California," except to request that petitioner's parents be "trained in relapse prevention and warning signs."

In a written order issued after the evidentiary hearing, the board concluded that petitioner could be "adequately controlled and treated in the community," but that "the supervision and treatment necessary for [his] conditional release [were] not available in the community" at the time. In its order, the board explained that its conclusion was

> "based upon the Board's decision that the proposed conditional release plan does not contain all the elements that it believes are necessary for [petitioner's] safe management in a community setting. Further, the Board was not comfortable with an initial release out-of-state where the Board could exercise little control over [petitioner's] treatment and supervision."

The board did not specify what "necessary elements" were missing from petitioner's conditional release plan, nor did it explain why it would have "little control" over petitioner if he were released to California under the plan.

At the end of its order, the board asked OSH to arrange for two additional evaluations of petitioner. Specifically, the board requested that OSH

> "obtain an outside sexual offender evaluation that would include polygraph testing, to further explore the sexual nature of [petitioner's] instant offense and history in light of the lack of observable psychotic symptoms witnessed by victims or police at the time of the criminal behaviors. Once that document has been received, the Board would ask the hospital to recommend a community mental health agency in Oregon to evaluate [petitioner] for possible conditional release placement."

We review the board's order for substantial evidence. ORS 183.482(8)(c). In doing so, we review both the board's factual findings and its legal conclusions derived from those findings. *Salosha, Inc. v. Lane County*, 201 Or App 138, 143, 117 P3d 1047 (2005). We review its findings to

determine whether they are supported by the evidentiary record; specifically, we review a finding to determine whether a reasonable person, viewing the record as a whole, could make the finding. ORS 183.482(8)(c). Thus, our task is not to make our own findings but rather to determine whether, viewing all the evidence in the record, the board could reasonably make the findings that it did. *Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990) ("[T]he court must evaluate evidence against the finding as well as evidence supporting it to determine whether substantial evidence exists to support [a] finding.").

We review the board's legal conclusions to determine whether they logically follow from its factual findings. *Drew v. PSRB*, 322 Or 491, 499-500, 909 P2d 1211 (1996). That is, we assess the board's reasoning, as expressed in its order. *Id.* As we have stated, "Our duty is to evaluate the board's logic, not to supply it." *Castro v. Board of Parole*, 232 Or App 75, 85-86, 220 P3d 772 (2009). Therefore, we require that the board explain its conclusions with at least sufficient detail for us to review its reasoning. *Salosha, Inc.*, 201 Or App at 144-45. If the board's reasoning cannot be ascertained or is faulty, then the order is not supported by "substantial reason." *See, e.g., Drew*, 322 Or at 500-01 (PSRB's order vacated on substantial reason grounds where, although substantial evidence existed in the record that could support PSRB's finding that the petitioner was a substantial danger to others, PSRB failed "to connect permissibly its facts and its holding"); *Alcala v. Employment Dept.*, 235 Or App 32, 38, 230 P3d 59 (2010) (order not supported by substantial reason where the board "did not explain" its conclusion).

For the reasons that follow, we conclude that the board's order in this case is not supported by substantial reason. As described above, the board concluded that "the supervision and treatment necessary for [petitioner's] conditional release [were] not available in the community." The board explained its conclusion by stating that petitioner's conditional release plan "[did] not contain all the elements that it believe[d were] necessary" for petitioner's safe management in the community, and the board added that it "was not comfortable with an initial release out-of-state where [it] could

exercise little control over [petitioner's] treatment and super-vision." As noted, the board did not specify what "necessary" "elements" were missing from petitioner's plan; nor did it explain why it would have "little control" over petitioner if he were released to California under the plan.

The board's failure to provide sufficient detail or explanation in support of its conclusion prevents us from reviewing the board's reasoning, as we are required to do. Because the board did not specify what "elements" were missing from petitioner's conditional release plan, we cannot assess the reasonableness of the board's conclusion that those elements were "necessary" for petitioner's release to the community. Similarly, because the board did not provide any factual or legal bases for its expressed discomfort with releasing petitioner to California—which it has the authority to do, OAR 859-070-0035[1]—we cannot assess whether those bases logically lead to the board's conclusion that it would have "little control" over petitioner. Thus, the board's order denying petitioner's conditional release is not supported by substantial reason.

We note that the board's order made recommenda-tions for further action by OSH, including a recommendation that OSH arrange for a second sex offender evaluation of petitioner. That recommendation suggests that the board denied petitioner's conditional release request because it believed that petitioner's conditional release plan might need to include sex offender treatment or supervision conditions. If so, that belief was based on an unsupported factual finding. The board recommended the second sex offender evaluation "to further explore the sexual nature of [petitioner's] instant offense and history *in light of the lack of observable psychotic symptoms witnessed by victims or police at the time of the criminal behaviors.*" (Emphasis added.) But, the record does not support the board's implicit finding that petitioner did not exhibit such symptoms.

As described, one of the young women, H, reported that, when petitioner contacted her, he was "mumbling" and

---

[1] OAR 859-070-035 provides, "The Board may consider and approve a condi-tional release plan to have the patient reside out of state."

"not making sense." Similarly, another one of the young women, S, reported that petitioner was "rambling" and she "did not understand what he was trying to say." In addition, a police officer reported that "it was evident [that petitioner] was struggling with things in his head" when he was interviewed. Moreover, Colistro, Passmore, and Walker, who had all reviewed the police reports, concluded that petitioner was exhibiting psychotic symptoms when he contacted the young women. And, Walker, who conducted the OSH sex offender evaluation, reported that petitioner was "in a floridly psychotic state at the time of his offense and his mental illness did in fact play a role in his actions." Thus, the record, viewed as a whole, does not support the board's implicit finding that petitioner did not exhibit observable psychotic symptoms when he contacted the young women at OSU or when he was interviewed by the police. Therefore, to the extent that the board denied petitioner's conditional release request because it believed that petitioner's conditional release plan might need to include sex offender treatment and supervision, the board's order is not supported by substantial evidence.

Reversed and remanded.