No. 334 April 29, 2026 17

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

NORTHWEST ENVIRONMENTAL ADVOCATES,
*Petitioner,*

*v.*

DEPARTMENT OF ENVIRONMENTAL QUALITY,
Environmental Quality Commission, and City of Medford,
*Respondents.*

Office of Administrative Hearings
2022ABC05250;
A181715

Argued and submitted May 12, 2025.

James N. Saul argued the cause for petitioner. Also on the briefs was Wild & Scenic Law Center.

Reilley D. Keating argued the cause for respondent City of Medford. Also on the brief were Michael R. Campbell, Beth S. Ginsberg, and Stoel Rives, LLP.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondents Department of Environmental Quality and Environmental Quality Commission. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

EGAN, J.

Affirmed.

**EGAN, J.**

Northwest Environmental Advocates (NWEA) seeks judicial review of a final order entered by the Environmental Quality Commission (EQC) approving National Pollutant Discharge Elimination System (NPDES) permit no. 100985 (the permit) issued as a renewal by the Oregon Department of Environmental Quality (DEQ) to the City of Medford for the operation of a wastewater treatment facility that discharges treated wastewater into the Rogue River.

On review, NWEA raises five assignments of error: (1) EQC erred by applying the wrong burden of proof to NWEA's permit challenges; (2) evidence does not support EQC's conclusion that the nitrogen and phosphorous effluent limitations of the NPDES permit will ensure compliance with the biocriteria standard in the Rogue River; (3) evidence does not support EQC's conclusion that those limitations will ensure compliance with Oregon's narrative water quality standards; (4) EQC erred by ruling that the removal from the new permit of a narrative prohibition on discharges that cause or contribute to violations of water quality standards found in the old permit did not constitute backsliding under the Clean Water Act; and (5) EQC abused its discretion by admitting expert opinion testimony from two unqualified witnesses and failing to explain in the final order how it weighed competing expert testimony.

The city and DEQ (respondents) oppose each of those arguments. However, as a preliminary matter, respondents argue that we should not reach NWEA's assignments of error because NWEA failed to exhaust available administrative remedies. They argue that, if NWEA had filed a petition for administrative review under OAR 340-011-0575, raising the issues it now raises on judicial review, then EQC would have had an opportunity to substitute its own judgment for that of the Administrative Law Judge (ALJ). Having not done so, respondents argue, we should not allow judicial review of NWEA's assignments of error under the administrative exhaustion doctrine.

As explained below, we conclude that NWEA adequately exhausted its administrative remedies by raising at

the contested case the issues it now raises on judicial review, with the exception of part of its fifth assignment of error. On its first assignment of error, any standard-of-proof error was invited by NWEA. On the merits, we conclude that substantial evidence supports EQC's determination that the permit will ensure compliance with the biocriteria standard, OAR 340-041-001, and the state-wide narrative criteria standard, OAR 340-041-0007(9); removal of the end-result provision from the 2011 version of the permit did not constitute backsliding under the Clean Water Act; and EQC did not abuse its discretion in admitting the expert opinion of two of respondents' witnesses. Accordingly, we affirm.

## I.  ADMINISTRATIVE EXHAUSTION & INVITED ERROR

We begin with respondents' argument regarding administrative exhaustion. The general doctrine of administrative exhaustion is "judicially created, a creature of the common law, and is employed by the courts * * * in the interest of orderly procedure and good administration." *Tuckenberry v. Board of Parole*, 365 Or 640, 646, 451 P3d 224 (2019).[1] The doctrine holds that "judicial review is only available after the procedure for relief within the administrative body itself has been followed without success." *Id.* (quoting *Mullanaux v. Dept. of Revenue*, 293 Or 536, 539, 651 P2d 724 (1982)). That is, where an agency has well-established procedures for raising issues before the administrative body, the doctrine requires a party to utilize those processes before petitioning this court for review. *Id.*; *Golden Rule Farms v. Water Resources Dept.*, 321 Or App 43, 48-49, 515 P3d 908 (2022). The doctrine is a prudential one that "can be relaxed, or even dispensed with altogether, depending on the circumstances." *Tuckenberry*, 365 Or at 646; *see also Marbet v. Portland Gen. Elect.*, 277 Or 447, 456, 561 P2d 154 (1977) (the doctrine is "not rigid but flexible").

---

[1] In *Tuckenberry*, the court initially considered whether the petitioner had exhausted administrative review by the State Board of Parole and Post-Prison Supervision, as required by ORS 144.335(1)(b), before seeking judicial review. *Tuckenberry*, 365 Or at 648-52. After concluding that the statute did not require issue exhaustion, the court proceeded to consider the common-law doctrine of administrative exhaustion. *Id.* at 652-55. In the case before us, no party has identified any statutory basis for an administrative exhaustion requirement; we understand the parties' arguments to address the common-law requirement.

Embedded in the administrative exhaustion doctrine is the requirement, itself prudential, that the specific issues being argued on judicial review were themselves exhausted; that is, "a party must have objected before the agency to errors he asserts on judicial review." *Marbet*, 277 Or at 456; *see also Mullanaux*, 293 Or at 541 ("A party does not exhaust his administrative remedies simply by stepping through the motions of the administrative process without affording the agency an opportunity to rule on the substance of the dispute."). For an issue to be exhausted, "the party advancing the argument must have made it before the agency with enough specificity to ensure that the agency was able to fully consider the point." *Innovative Design & Construction, LLC v. Construction Contractors Board*, 278 Or App 448, 454, 375 P3d 533 (2016); *see also Becklin v. Board of Examiners for Engineering and Land Surveying*, 195 Or App 186, 199-200, 97 P3d 1216 (2004), *rev den*, 338 Or 16 (2005) (denying judicial review when the petitioner failed to file exceptions to an amended order that raised new issues that had not arisen before the administrative law judge).

In the context of contested case hearings, we have held that, unless specifically required by statute or agency rule, a party need not file exceptions to a proposed order to exhaust administrative review, so long as the errors asserted on judicial review were raised before the deciding agency or hearings officer that issued the order. *Reforestation General v. Natl. Council on Comp. Ins.*, 127 Or App 153, 157-59, 872 P2d 423, *ahd'd to on recons*, 130 Or App 615 (1994), *rev den*, 320 Or 749 (1995) (allowing judicial review of an adopted final order entered by the Department of Insurance and Finance (DIF), absent the filing of exceptions, when all of the issues raised by the petitioner on judicial review were before the hearings officer and DIF had before it the entire record when adopting the order); *Watts v. Board of Nursing*, 282 Or App 705, 708-10, 386 P3d 34 (2016) (allowing judicial review of an ALJ's proposed order, adopted by the Oregon State Board of Nursing, absent the filing of exceptions, finding the issues "preserved" when the issues were before the agency with enough specificity to allow it to avoid committing error in the final order); *see also Wolff v. Board of Psychologist Examiners*, 284 Or App 792, 802-03, 395 P3d

44 (2017) (allowing judicial review of issues not included in the party's exceptions to a proposed order when those issues had been raised before the ALJ in deciding the contested case).[2]

The Oregon Department of Justice's rules for proposed orders and filing exceptions in contested cases before the Office of Administrative Hearings, OAR 137-003-0645 and OAR 137-003-0650, implement ORS 183.460.[3] OAR 137-003-0645(5) provides that

> "[i]f the recommended action in the proposed order is adverse to any party, the proposed order shall also include a statement that the party *may* file exceptions and present argument to the agency or, if authorized to issue the final order, to the administrative law judge."

(Emphasis added.) OAR 137-003-0650(1), (2) substantially repeats the language of OAR 137-003-0645(5), while providing to agencies the option for an administrative law judge to review any written exceptions the agencies receive.

In *Watts*, we said that those rules, as well as the notice of the right to appeal sent by the agency to the party, both characterized the filing of exceptions as optional—highlighting the use of the word "may"—and did not inform the party that opting not to file exceptions would preclude the availability of judicial review. 282 Or App at 709-10. In *Reforestation General*, we determined that ORS 183.460 did not require the petitioner to file exceptions "where all of the issues raised by the petitioner on appeal were before the hearings officer," explaining that "the petitioner's failure to restate its argument in the form of exceptions to a proposed order does not deny the agency an opportunity to

---

[2] Some agency statutes or rules expressly require a request for review of a proposed order before the agency as a prerequisite for judicial review. *See* ORS 144.335(1)(b); OAR 436-001-0246(1) ("[A] party must seek director review of a proposed and final order before petitioning for judicial review.").

[3] ORS 183.460 provides:

"Whenever in a contested case a majority of the officials of the agency who are to render the final order have not heard the case or considered the record, the order, if adverse to a party other than the agency itself, shall not be made until a proposed order, including findings of fact and conclusions of law, has been served upon the parties and an opportunity has been afforded to each party adversely affected to file exceptions and present argument to the officials who are to render the decision."

conduct a meaningful and informed review of the merits of the case." 127 Or App at 159. Under our case law, then, when the agency adopting a proposed order as a final order has before it the entire record, including a party's arguments on issues for which the party later seeks judicial review, that party need not file exceptions for the purpose of administrative exhaustion, unless a statute or rule explicitly states that failure to do so precludes judicial review.

Therefore, since NWEA did not file exceptions to the ALJ's proposed order, we must first determine whether any statute or rule required it to do so before availing itself of judicial review. All parties cite OAR 340-011-0575 to support their arguments about whether filing exceptions was a mandatory step to exhaust administrative remedies.

OAR 340-011-0575 provides procedures for petitioning for EQC review of a proposed order, but it does not indicate that failure to do so precludes judicial review.[4] The rule—like OAR 137-003-0645—implements ORS 183.460,

---

[4] The parties primarily dispute the effect of sentences extracted from subsections (2), (4)(a), and (6) of OAR 340-011-0575, none of which indicate that failure to file exceptions precludes judicial review. Subsection (2) provides the time by which a petition for commission review of a proposed order must be filed before the order becomes final:

"Commencement of Review by the Commission: The proposed order will become final unless a participant or a member of the commission files a Petition for Commission Review within 30 days of service of the proposed order. The timely filing of a Petition is a jurisdictional requirement and cannot be waived. Any participant may file a petition whether or not another participant has filed a petition."

In context, we understand the reference to "a jurisdictional requirement" in that rule to refer to jurisdiction for the subject of the rule—"Review by the Commission"—not judicial review.

Subsection (4)(a) provides the procedure for filing written exceptions and the opening brief for administrative review, including the effect not raising exceptions in the brief will have on the extent of administrative review:

"Exceptions and Brief: Within 30 days from the filing of a petition, the participant(s) filing the petition must file written exceptions and brief. * * * Failure to take an exception to a finding or conclusion in the brief, waives the participant's ability to raise that exception."

Subsection (6) provides the scope of review afforded to the commission on administrative review:

"Scope of Review: The commission may substitute its judgment for that of the administrative law judge in making any particular finding of fact, conclusion of law, or order except as limited by ORS 183.650 and OAR 137-003-0665."

which, as set out above, 349 Or App at 22 n 2, requires an *opportunity* for parties to file exceptions to a proposed order. It does not, however, purport to displace the rules for contested cases before the Office of Administrative Hearings, which include OAR 137-003-0645 and OAR 137-003-0650.[5] The proposed order provided the parties with notice of their right to petition for EQC review under OAR 340-011-0575 and included a description of the applicable procedures, such as time limits and the process for filing exceptions. Additionally, the proposed order included the following statement, as required by OAR 137-003-0645(5), explaining that the proposed order will become final, absent a petition for administrative review, and notifying the parties of their right to petition for judicial review of the final order:

> "Unless you timely file a Petition for Review as set forth above, this Proposed Order becomes the Final Order of the Commission 30 days from the date this Proposed Order is mailed to you. If you wish to appeal the Final Order, you have 60 days from the date the Proposed Order becomes the Final Order to file a petition for review with the Oregon Court of Appeals. *See* ORS 183.480 et. seq."

That statement, taken together with OAR 340-011-0575 and OAR 137-003-0645(5)—as was the case in *Watts*—indicates that adversely affected parties *may*, but are not required to, petition for administrative review before the order becomes final, at which point the parties have 60 days to file a petition for judicial review of the final order. As in *Watts*, in this case, filing exceptions with EQC was not a necessary step for the purposes of administrative exhaustion.[6]

Having determined that filing exceptions to the proposed order was not necessary, we next consider whether the issues raised on judicial review were before EQC when it adopted the ALJ's proposed order as its final order.

---

[5] "Except as otherwise provided in OAR 340, division 011, contested cases will be governed by the Rules of the Office of Administrative Hearings, specifically OAR 137-003-0501 through 0700." OAR 340-011-0500; *see also* OAR 340-011-0575(6) (limiting the scope of administrative review according to the terms of OAR 137-003-0665).

[6] Our conclusion is consistent with *Oil Re-Refining Co. v. Environmental Quality Comm.*, 273 Or App 502, 361 P3d 46, (2015), *aff'd*, 361 Or 1 (2017). There, we addressed the merits of arguments raised on judicial review although no party had petitioned for review before the EQC. *Id.* at 507.

*Reforestation General*, 127 Or App at 159; *Watts*, 282 Or App at 710. NWEA's assignments of error two, three, and four raise issues that were squarely before the ALJ in the contested case, and NWEA's arguments on those issues were raised in a variety of places in the record. Therefore, those assignments are properly before us on judicial review.

Assignment of error five concerns the admission of opinion testimony of two witnesses that NWEA argues were unqualified under OAR 137-003-0610(1) to offer parts of their opinions. The record shows that NWEA objected to the qualification of each witness to offer expert opinion testimony during the contested case and provided argument for the basis of its objections; therefore, whether such expert opinion testimony was lawfully admitted is properly before us on judicial review. However, NWEA also argues that EQC erred by not adequately explaining, in the final order, how it weighed competing expert testimony. That contention was not before EQC when it adopted the final order, and NWEA forwent its opportunity to raise that issue when it elected not to file exceptions; in other words, that issue was not exhausted as required by the administrative exhaustion doctrine. We will review the exhausted issue of whether EQC abused its discretion in accepting the ALJ's admission of the expert testimony of each contested witness.

The first assignment of error presents a different reviewability concern. On that assignment, NWEA argues that the ALJ erred in requiring NWEA and the city, as proponents of the issues they raised, to prove each of their substantive challenges to the NPDES permit by a preponderance of the evidence as required by ORS 183.450(2) and OAR 340-011-0545(2). On judicial review, NWEA now argues that the Clean Water Act requires an "ensure compliance" standard of proof. DEQ argues that, because NWEA argued for the burden of proof that the ALJ ultimately applied, any error was invited, and we should decline to consider the first assignment of error. *Teamsters Local Union #223 v. Lake County*, 208 Or App 271, 277-79, 145 P3d 187 (2006) (assessing for invited error after determining that administrative remedies had been exhausted).

DEQ is correct. In the contested case, all parties argued for a burden of proof derived from ORS 183.450(2) and OAR 340-011-0545(2), rather than the Clean Water Act. The final order reflects that understanding. NWEA began its opening statement in the contested case hearing with reference to the "ensure compliance" standard, referring to it as the burden of proof; however, in its written closing arguments, NWEA unambiguously argued that the proper procedural standard of proof was the preponderance of the evidence standard that the ALJ applied. The very next paragraph in its closing argument is about the "ensure compliance" standard; however, there the standard is presented as the substantive standard that NPDES permits must satisfy before DEQ may issue them. Because the ALJ applied the procedural standard of proof that NWEA argued for in its closing arguments, we conclude that any error was invited and decline to review the first assignment of error on that basis. *Teamsters Local Union #223*, 208 Or App at 279 (declining to consider argument on review after finding that the error was invited).

Next, we turn to the merits of assignments of error two, three, and four, and part of assignment of error five.

## II.   BACKGROUND AND ANALYSIS

The federal Clean Water Act requires a NPDES permit to discharge pollutants into waters of the United States, including the Rogue River. 33 USC § 1342; 40 CFR § 122.1(b). In Oregon, DEQ is responsible for administering the NPDES program. ORS 468B.035(1). NPDES permits must include limitations to control the discharge of pollutants which "will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard." 40 CFR § 122.44(d)(1)(i). DEQ's permits must "ensure compliance with the applicable water quality requirements of all affected States." 40 CFR § 122.4(d).

When reviewing a final order following a contested case, we are limited to the record and may not substitute our own judgment for that of the agency as to any issue of fact or exercise of discretion. ORS 183.482(7). We review an agency's findings of fact for substantial evidence in the record

to support those findings. ORS 183.482(8)(c). "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c). In reviewing for substantial evidence, "we also review the agency's order for substantial reason—that is, we determine whether the [agency] provided a rational explanation of how its factual findings lead to the legal conclusions on which the order is based." *Bandon Pacific v. Environmental Quality Commission*, 273 Or App 355, 362, 359 P3d 394 (2015) (quoting *Arms v. SAIF*, 268 Or App 761, 767 343 P3d 659 (2015)). Accordingly, the following facts are taken from the final order.

The city operates the Medford Regional Water Reclamation Facility, which discharges treated wastewater into the Rogue River. In 2021, DEQ issued the city a renewed NPDES permit after their prior permit (2011 permit) expired. While the facility operated under the 2011 permit, the Rogue River downstream of the facility was listed by the United States Environmental Protection Agency (EPA) as an impaired waterway for exceedance of the biocriteria standard. The biocriteria standard is a water quality standard found in OAR 340-041-0011 and reads in full:

> "Waters of the State must be of sufficient quality to support aquatic species without detrimental changes in the resident biological communities."

Studies of the Rogue River's water quality revealed detrimental algal growth resulting, in part, from elevated levels of the nutrients nitrogen and phosphorous discharged by the facility under the conditions provided in the old permit.

To address the biocriteria exceedance, the new permit includes a ratcheting schedule for numerical effluent limitations for both total nitrogen and phosphorous discharges. Schedule A.1 of the permit includes a final average monthly nitrogen limit of 850 pounds per day, an interim average monthly total phosphorous limit of 170 pounds per day, and a final average monthly total phosphorous limit of 100 pounds per day, each to be obtained during the period from April 1 through October 31 each year. These reductions amount to a 75 percent and 80 percent reduction from current discharge levels for nitrogen and phosphorus, respectively. DEQ did not

include limits from November to March because it determined that the winter months were a non-growth period for the macrophytes and algae that present water quality problems in the river. The new permit omits a condition of the previous permit that categorically disallowed discharges or activities "that cause[d] or contribute[d] to a violation of water quality standards in OAR 340-041 applicable to the Rogue Basin."

To determine the permit limits on the discharge of nitrogen and phosphorus, DEQ had to first identify appropriate target concentrations for the section of the Rogue River downstream of the facility. To do that, DEQ relied on EPA's Nutrient Criteria Technical Guidance manual to determine an appropriate methodology, electing to use the "reference reach" method. The reference reach method recommends identifying reference nutrient concentrations by looking to a general population of similar streams and determining the 5th to 25th percentile nutrient concentration across the dataset derived from that population. For this step, DEQ used ambient nutrient data derived from the Nutrient Scientific Technical Exchange Partnership & Support (N-STEPS) database for all waterways across Oregon and surrounding states to arrive at the 25th percentile concentrations—0.470 milligrams per liter (mg/L) total nitrogen and 0.040 mg/L for total phosphorus. DEQ chose to use the 25th percentile, rather than a lower figure, because the dataset contained a significant number of undisturbed waterways.

Next, DEQ relied on measurements taken from a relatively undisturbed section of the Rogue River upstream of the facility to determine that a ratio of 6:1 total nitrogen to total phosphorus was an appropriate target. Those measurements also revealed a high concentration of phosphorous in that section of the river, which indicated to DEQ a low ambient concentration of nitrogen. Without nitrogen, aquatic organisms cannot utilize phosphorous for growth. This suggested to DEQ that total phosphorus limits could be set above the 25th percentile target because the additional phosphorus would have little impact on aquatic plant growth without additional nitrogen loading. Accordingly, DEQ began with a target concentration of 0.470 mg/L of nitrogen and set the target concentration for phosphorous

at 0.078 mg/L. These target concentrations were used to set the permit's discharge limits of each nutrient.

A.   *The Biocriteria Standard*

In their second assignment of error, NWEA argues that EQC's determination that the permit's discharge limits ensure compliance with the biocriteria standard, OAR 340-041-001, is not supported by substantial evidence and that the order does not provide substantial reasoning to rationally explain its conclusion. In support of this argument, NWEA renews arguments it made at the contested case. It argues that DEQ's use of N-STEPS data from across the entire state, rather than the two most nearby and similar ecoregions, led DEQ to select target concentrations that are too high to address biocriteria impairment in the river. Further, it argues, the selection of the 25th percentile from that data had no scientific relationship to compliance with the biocriteria water quality standard in the Rogue River. It also argues that DEQ's decision to adjust phosphorus levels upward, rather than adjusting nitrogen levels downward, to maintain the 6:1 target ratio, was misguided and will not ensure compliance with the biocriteria standard because the levels set will not control the growth of *cladaphora*— an algal species that indicates water quality impairment— already present downstream of the facility.

Respondents argue that substantial evidence supports the order's finding that the nutrient limits will ensure compliance with the biocriteria standard and that the finding is explained with substantial reason—a description of the exhibits and testimony heard, a brief explanation of why respondents' evidence and arguments were more persuasive, and the conclusion that NWEA did not establish by a preponderance of the evidence that the permit's nutrient limits would not ensure compliance with the biocriteria standard.

Our standard of review does not allow us to reweigh or reassess the credibility of evidence presented to the fact-finding body. *WaterWatch of Oregon v. Water Resources Dept.*, 324 Or App 362, 384, 527 P3d 1, *rev den*, 371 Or 332 (2023); *see also Friends of Parrett Mountain v. Northwest Natural*, 336 Or 93, 105, 79 P3d 869 (2003) ("[T]he probative weight

to be accorded the testimony of expert witnesses is for the trier of fact to apportion."). When expert opinions have been offered on both sides of an issue, "it is usually clear that a factfinder has found one or the other more persuasive, and substantial evidence and reason will exist to support the finding, without further explanation." *Noble v. Oregon Water Resources Dept.*, 264 Or App 110, 123, 330 P3d 688, *rev den*, 356 Or 516 (2014) (quoting *Castro v. Board of Parole*, 232 Or App 75, 84, 220 P3d 772 (2009)). Indeed, "a simple conflict in evidence is not a sufficient basis for this court to conclude that the [agency's] findings * * * are unsupported by substantial evidence." *Friends of Parret Mountain*, 336 Or at 106.

Here, the ALJ heard evidence from experts on both sides of the issue, each basing their testimony on extensive technical guidance and data used to arrive at their competing opinions. In the order, EQC clearly weighs the competing expert opinions and finds that NWEA "did not present sufficient evidence to overcome DEQ's use of the 6:1 total nitrogen-total phosphorus ratio to adjust the target phosphorus concentration level upward." The order similarly weighs competing testimonial and scientific evidence regarding the appropriate use of the N-STEPS data and agreed with DEQ and the city's experts' explanation that using the broader dataset avoided the potential for bias that could result from using the smaller, more regional set. While it is true that the nutrient limits were derived, in the absence of more immediately applicable data, from estimates based on a broad set of nutrient concentration data contained in the N-STEPS database, "in many science-based policymaking contexts, under the CWA the [agency] is required to exercise its judgment even in the face of some scientific uncertainty." *Upper Blackstone Water Pollution Abatement Dist. v. E.P.A.*, 690 F3d 9, 23-24 (1st Cir. 2012), *cert den*, 569 US 972 (2013) (finding that EPA's "conclusions [were] not invalid" because they relied on estimations derived from datasets).

Ultimately, EQC disagreed with NWEA that the permit's nutrient limits would not ensure compliance with the biocriteria standard. On the second assignment of error, we have determined that EQC's findings are supported by substantial evidence in the record such that the

evidence "would permit a reasonable person to make that finding," ORS 183.482(8)(c), and its conclusions derived from those findings were adequately explained with substantial reasoning.

B.  *The Statewide Narrative Criteria Standard*

On its third assignment of error, NWEA argues that EQC's determination that the permit conditions ensure compliance with the statewide narrative water quality criteria, OAR 340-041-0007(9), is not supported by substantial evidence. The relevant statewide narrative water quality criterion, OAR 340-041-0007(9), prohibits "[t]he development of fungi or other growths having deleterious effect on stream bottoms, fish or other aquatic life, or that are injurious to health, recreation, or industry." NWEA argues that the growth of algae and aquatic weeds downstream of the facility has been injurious to recreational uses of the river and that the permit does not ensure future compliance with the standard.

Respondents counter that what is needed to ensure compliance with OAR 340-041-0007(9) is captured by the limitations designed to ensure compliance with the biocriteria standard because both impairments are the result of algal overgrowth caused by current, imbalanced nutrient loads downstream of the facility. We understand EQC to have made the same finding in the final order when it stated that, "[g]iven the past and current levels of algal and aquatic weed growth in the river, there is insufficient evidence to establish that the Permit, with its more stringent nutrient limitations, will not ensure compliance with the narrative criteria."

NWEA's primary argument on this assignment is directed at the credibility of the witnesses and propriety of the evidence presented on this issue during the contested case. As stated above, it is not our function to review the credibility of evidence, including expert testimony. *Friends of Parret Mountain*, 336 Or at 105-06. Where the fact-finder has weighed competing evidence and expert testimony to arrive at a reasonable conclusion, we will ordinarily affirm. *Noble*, 264 Or App at 123. In accordance with that approach, on NWEA's third assignment of error, we conclude that

EQC's finding that the permit will ensure compliance with the statewide narrative criteria is supported by substantial evidence and substantial reason.

## C.   *The Anti-Backsliding Provision*

In its fourth assignment of error, NWEA renews an argument it made in a motion for partial summary judgment, the denial of which was incorporated into the final order. It argues that DEQ violated the anti-backsliding provision of the Clean Water Act, 33 USC § 1342(o), when it removed from the 2021 permit a narrative condition that had been in the 2011 version of the permit. That permit condition provided that "[n]o wastes may be discharged or activities conducted that cause or contribute to a violation of water quality standards in OAR 340-041 applicable to the Rogue Basin." The anti-backsliding provision disallows the renewal, reissue, or modification of permits that "contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit," with some exceptions. 33 USC § 1342(o).

NWEA's argument is inconsistent with the United States Supreme Court's recent decision in *City and County of San Francisco v. Environmental Protection Agency*, 604 US 334, 145 S Ct 704, 221 L Ed 2d 166 (2025). In that case, the Court held that agencies administering the Clean Water Act are not authorized to include "end-result" requirements in NPDES permits. *Id.* at 345, 354-355 (distinguishing allowable narrative limitations, such as those that require permittees to do such things as follow "best practices," from "end-result" requirements that condition compliance on whether the receiving waters meet applicable water quality standards). Therefore, removal of such an "end-result" requirement from the NPDES permit at issue in this case did not constitute backsliding under the Clean Water Act, disposing of NWEA's fourth assignment of error.

## D.   *Admission of Expert Testimony of Ms. Nomura and Dr. Annear*

In its fifth assignment of error, NWEA argues that EQC should have excluded the opinion testimony of one of DEQ's witnesses and one of the city's witnesses because

they were each unqualified to give opinion testimony that the nutrient limits in the permit would ensure compliance with the state-wide narrative criteria standard and biocriteria standard, respectively. Those arguments are preserved, as NWEA objected to each witness being recognized as an expert for their proffered testimony. As described above, this assignment of error contained further arguments that were not exhausted before the agency. Accordingly, we will review EQC's admission of the opinion testimony of the two witnesses.

We review an agency's decision to admit evidence in a contested case, including opinion testimony, for abuse of discretion. *Bonneville Auto Ins. v. Ins. Div.*, 53 Or App 440, 449, 632 P2d 796 (1981); ORS 183.482(8)(b). Evidence is admissible if it is relevant and reliable; evidence is reliable if it is "of a type commonly relied upon by reasonably prudent persons in conduct of their serious affairs." ORS 183.450(1); OAR 137-003-0610(1); *Reguero v. Teacher Standards and Practices*, 312 Or 402, 417, 822 P2d 1171 (1991) (evidence is admissible "as long as it meets the statutory test of reliability" under ORS 183.450(1)). As we have observed in previous cases, "the rules of evidence except those of privilege do not apply to administrative agencies in contested cases." *Premsingh & Assoc. v. Natl. Council on Comp. Ins.*, 111 Or App 624, 628, 826 P2d 120, *rev den*, 313 Or 300 (1992) (citing ORS 183.450 and Kirkpatrick, *Oregon Evidence* 3 (2d ed 1989)). Accordingly, administrative law judges have a wider range of discretion to admit evidence, so long as it meets the requirements of relevance and reliability. Finally, "we may not reverse on the basis of an erroneous evidentiary ruling unless a party's rights were substantially prejudiced by the ruling." *OR-OSHA v. Tom O'Brien Construction Co., Inc.*, 148 Or App 453, 462, 941 P2d 550 (1997), *aff'd*, 329 Or 348 (1999) (citing ORS 183.450).

In support of its arguments at the contested case hearing, DEQ called as a witness DEQ Water Quality Program Manager Ranei Nomura. Ms. Nomura testified that she had been in her role for about nine years and that, prior to her current position, she was a permit writer for DEQ. In her role as Water Quality Program Manager, she

testified that her responsibilities include implementing the Wastewater Permitting Compliance program in DEQ's western region, as well as the agency's Clean Water State Revolving Fund program. NWEA objected to Ms. Nomura offering opinion related to scientific or technical expertise but did not object to her testifying about DEQ's permitting process.

In the final order, EQC cites the testimony of Ms. Nomura and a separate, uncontested witness for the proposition that the new effluent limitations will ensure compliance with the state-wide narrative criteria standard. All other citations to the testimony of Ms. Nomura are in the context of permit processes and DEQ's interpretation of regulatory terms. As a former permit writer and current Water Quality Program Manager, EQC did not abuse its discretion in admitting Ms. Nomura's opinion testimony about water quality permit processes and the agency's interpretation of regulations, as her vocational experience and responsibilities render her opinion testimony on those matters sufficiently reliable. Because her testimony was not the only evidence admitted for the proposition that the effluent limitations would ensure compliance with the state-wide narrative criteria—other expert opinions and ample evidence of DEQ's process for arriving at the effluent limitations was also admitted—and EQC ultimately determined that "there is insufficient evidence to establish that the Permit, with its more stringent nutrient limitations, will not ensure compliance with the narrative criteria," any error in admitting Ms. Nomura's testimony on the subject did not substantially prejudice NWEA's rights.

In support of its arguments at the contested case hearing, the city called as a witness Dr. Annear. Annear holds advanced degrees in civil and environmental engineering. EQC found that Annear's work experience includes hydrodynamic and water quality modeling to support clients with regulatory permits, storm water management, drinking water studies, surface water system assessments, and water quality data analysis. EQC further found that he has extensive project experience, including in fields such as water supply management, drinking water source

protection, storm water management and integrated planning, mixing zone studies, and total maximum daily loads under the Clean Water Act.

NWEA argues that Annear was not qualified to give expert opinion testimony on the relationship between nutrients and algal growth, including whether the permit's nutrient limits will achieve compliance with the biocriteria standard. It further argues that the ALJ abused their discretion to admit Annear's testimony on the application of the N-STEPS data because he had not personally used the data. Given Annear's extensive educational and vocational experience in relevant fields, including hydrodynamic and water quality modeling to support clients with regulatory permits, water quality data analysis, drinking water source protection, and supporting clients with TMDLs under the Clean Water Act, we conclude that EQC did not abuse its discretion in admitting his opinion testimony regarding water quality modeling and data interpretation, even though he had not used the particular N-STEPS dataset. While his expertise is not particularized to algal growth, his work using water quality monitoring to assist clients with regulatory permit compliance is sufficiently related such that EQC did not abuse its discretion in deciding that his opinion on the matter was "of a type commonly relied upon by reasonably prudent persons in conduct of their serious affairs." ORS 183.450(1). Therefore, EQC did not abuse its discretion by admitting the testimony of either witness raised in NWEA's fifth assignment of error.

Affirmed.