Argued and submitted September 17, 2014, reversed and remanded for reconsideration August 26, 2015

BANDON PACIFIC, INC.,
*Petitioner,*

*v.*

ENVIRONMENTAL QUALITY COMMISSION,
*Respondent.*

Office of Administrative Hearings
1001950; A150445

359 P3d 394

Bruce L. Campbell argued the cause for petitioner. With him on the briefs were Kelly S. Hossaini and Miller Nash LLP.

Inge Wells, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Stephanie L. Striffler, Assistant Attorney General.

Before DeVore, Presiding Judge, and Ortega, Judge, and Garrett, Judge.*

GARRETT, J.

_____

* Ortega, J., *vice* Haselton, C. J.

**GARRETT, J.**

Petitioner seeks judicial review of a final order by the Environmental Quality Commission (EQC) that imposed a civil penalty of $200,266. Between January 2004 and December 2008, a seafood processing plant owned by petitioner committed numerous violations of its National Pollution Discharge Elimination System (NPDES) permit and state laws applicable to the disposal of solid fish waste. Conceding that the violations occurred, petitioner nonetheless argues, in four assignments of error, that the EQC erred in its calculation and imposition of the civil penalty. We reject three of those assignments without further discussion, writing only to address petitioner's argument that the EQC should have deemed the violations "minor" rather than "moderate" for purposes of calculating the penalty. For the reasons that follow, we conclude that EQC's determination that petitioner's violations were moderate in magnitude is not supported by substantial reason. We therefore reverse and remand.

We take the findings of historical fact as they were determined by the administrative law judge (ALJ), because those findings were adopted by the EQC and, in any event, petitioner does not challenge them on judicial reviews. *WaterWatch of Oregon, Inc. v. Water Resources Dept.*, 259 Or App 717, 720, 316 P3d 330 (2013), *rev allowed*, 355 Or 317 (2014). Petitioner owned and operated a seafood processing facility in Bandon, along the Coquille River, approximately one-half mile up from where the river enters the Pacific Ocean. Historically, the facility processed millions of pounds of fish each year. In 1999, however, petitioner stopped producing large quantities of seafood at that location and turned the site into a retail-only operation that processed only as much fish as needed to serve the facility's retail customers.

During the relevant time, January 2004 to December 2008, the facility processed between 49,000 and 59,000 pounds of fish per year. It operated under an NPDES permit issued by the Oregon Department of Environmental Quality (DEQ).[1] Although NPDES permits are required by the

---

[1] Technically, there were two permits: one in effect until September 2006, and a second, revised permit in effect from then until May 2011. However, the

federal Clean Water Act, in Oregon, the permitting program is administered by the DEQ. *See ONRC Action v. Columbia Plywood, Inc.*, 332 Or 216, 218, 26 P3d 142 (2001) (explaining permitting scheme). In this case, the permit imposed four requirements on petitioner. First, it required all "wastewaters" to pass through "at least a 40 mesh screen * * * prior to discharge."[2] Second, it required petitioner to seek approval from DEQ before disposing "seafood processing residuals" into the waters of the state. Third, it required that petitioner monitor its wastewater by performing a series of specified tests and measurements. Fourth, it required petitioner to record the results of those measurements and submit a "discharge monitoring report" (DMR) to DEQ each month.

During the relevant period, petitioner violated the terms of the permit in several ways. The facility's employees flushed the wastewater from the processed fish through a square drain on the floor of the facility that emptied directly into the Coquille River. The drain had a screen that caught some solid waste, but that screen did not meet the "40 mesh" requirement of the permit. Employees discharged the "seafood processing residuals" (fish carcasses) onto a chute that led directly into the Coquille River without, as the permit required, first obtaining DEQ approval. Petitioner also did not monitor its wastewater discharge. From January 2004 to December 2008, it submitted monthly DMRs to DEQ that simply stated "no production."

On December 3, 2008, petitioner's attorney sent a letter to DEQ that advised the agency that petitioner had committed permit violations and submitted inaccurate DMRs. Petitioner later submitted corrected DMRs that provided estimates of the amount of seafood processed each month, but did not include any information about water sampling results or about solid waste disposal. Petitioner

---

relevant terms of the two permits were nearly identical in substance; the fact that two different permits were in effect at different times is immaterial to the issues on judicial review. Accordingly, we refer to the permits collectively as the "permit."

[2] In his proposed final order, the ALJ explained that "mesh" refers to "the number of openings per square inch on the screen. When a screen has a higher mesh count, each hole is normally smaller than would be the case with a lower mesh screen. When the mesh is higher, fewer solids can pass through the screen."

stopped disposing of solid wastes directly into the river sometime in December 2008. In January 2009, petitioner installed a drain screen that satisfied the "40 mesh" permit requirement. Eventually, petitioner connected the drain to the city sewer and stopped discharging wastewater directly into the Coquille River.

In November 2009, DEQ issued to petitioner a notice of civil penalty. According to the department's formula (which was included in the notice), the "base penalty" for a violation is determined in part by the magnitude of that violation. Thus, for example, a violation that is determined to be "moderate" will result in a higher penalty than a violation that is determined to be "minor." *See* OAR 340-012-0140. DEQ's notice classified all of petitioner's violations as "moderate" in magnitude. Petitioner requested a contested case hearing and argued, among other things, that the proposed penalty of $208,554 contained in DEQ's notice should be reduced because the violations should be classified as minor rather than moderate.

By administrative rule, DEQ has assigned specific magnitudes to some categories of violations. The violations that petitioner committed are not among those that are assigned a magnitude by rule. *See* OAR 340-012-0135. Violations that are not assigned a different magnitude by rule are presumed to be moderate. OAR 340-012-0130(1). That presumption, however, is rebuttable. According to OAR 340-012-0130(2), a party may prove that a lesser magnitude applies by producing evidence that a lesser magnitude is "more probable than the presumed magnitude." OAR 340-012-0130(4) explains what must be true for a violation to be minor:

> "The magnitude of the violation is minor if [DEQ] finds that the violation had no more than a de minimis adverse impact on human health or the environment, and posed no more than a de minimis threat to human health or other environmental receptors. In making this finding, [DEQ] will consider all reasonably available information including, but not limited to: the degree of deviation from applicable statutes or commission and [DEQ] rules, standards, permits or orders; the extent of actual or threatened effects

of the violation; the concentration, volume, or toxicity of the materials involved; and the duration of the violation."

At the contested case hearing, petitioner submitted evidence that included an underwater survey of the river near the processing facility. The ALJ made specific findings with respect to that evidence:

"In 2010, [petitioner] retained the services of Alan Ismond, a chemical engineer, and his company Aqua-Terra Consultants. Mr. Ismond formed the company in 1993 to provide engineering and environmental consulting services to the seafood processing industry. In late 2010, Mr. Ismond commissioned a survey of the Coquille River bed in the area near [petitioner's] facility. The survey revealed no visible remains of fish carcasses. [Petitioner] discharged fish wastes in an area of the river near the mouth of the Pacific Ocean. Because of that proximity, currents and tidal exchanges were substantial and likely dispersed any discharges of wastewater and fish carcasses very quickly. Because the waste did not accumulate on the river bed, Mr. Ismond concluded that the material was likely quickly dispersed into the ocean with no significant impact on the environment."

Those findings were supported by the report by Aqua Terra Consultants, which concluded that there was "no evidence of impact by either solid or liquid disposal on the seabed." They were also supported by the testimony of Ismond. During the hearing, Ismond testified that he commissioned divers to survey the river near the facility. The divers did not see piles of fish carcasses or any other evidence of petitioner's activities. Based on the divers' observations, Ismond concluded that there was "no impact to the environment" at the time of the river survey.[3]

---

[3] Ismond explained:

"There were no visible remains from the discharge. And generally, the waste piles that I deal with are [from] clients that discharge substantial amounts of seafood waste and you'll end up with like a one to seven-acre waste pile. It can be twenty feet deep.

"In the case of waste piles of that size and magnitude, you know you're having an impact on the seafloor, you know you're having an impact on benthic organisms.

"But in the case of this survey, they couldn't find a waste pile, so my conclusion is if there's no waste pile, there's not likely to be any impact on the receiving environment."

Ismond's testimony did not end there, however. Ismond also hypothesized that the reason why no waste pile was found was that, because of the proximity to the mouth of the Coquille River, the waste was likely quickly dispersed into the ocean. Ismond testified that the discharged waste was "a non-toxic material" and that the amount of discharge was relatively small.[4] Based on those observations, Ismond opined that it was "more than likely" that petitioner's activities would have had no impact on the environment during the period covered by the alleged violations.[5]

DEQ put forth no evidence to contradict Ismond or the report by Aqua Terra Consultants. DEQ's cross-examination of Ismond was limited to questions about whether Ismond was familiar with other seafood processors and whether he knew of another facility that had submitted

---

[4] Ismond testified as follows:

"Let me clarify one thing. We should characterize what the waste is that they discharged. It wasn't mercury. It wasn't oil. It wasn't gasoline. It was fish. So by its very nature, it's not a—it's a non-toxic material.

"And in terms of quantities, looking at the quantities that they processed and the receiving environment, I would not imagine there would be an adverse impact. The quantities were too small and the receiving environment is too energetic for me to expect an adverse impact."

[5] During the contested case hearing, the following exchange occurred between Ismond and petitioner's attorney:

"Q. When was the seafloor survey done again?

"A. The report is dated November 10, 2010, and the survey was done, I guess, November 4, 2010.

"Q. And was the plant processing then?

"A. The plant, I believe, was discharging to city sewer at the time.

"Q. Okay. And would you expect to have seen the results if this had been done when they were processing through the offal?

"A. More than likely.

"Q. And why is that?

"A. Because of the de minimis quantity process discharge and the receiving environment, I wouldn't expect there to be any significant impacts.

"Q. In your professional opinion, did the wastewater discharges from Bandon have more than a de minimis impact or threat to human health or the environment?

"A. No.

"Q. And why?

"A. Again, because of the type of material being discharged, the quantity of material being discharged, and the receiving environment that it was going into."

inaccurate DMRs indicating "no production." DEQ did not ask Ismond about the results of the river survey or the conclusions that he drew from it. Nor did DEQ question him about his impression of the river near the facility as "energetic" or his characterization of the waste that petitioner deposited into the river as "small" amounts of "non-toxic material." The ALJ did not make any credibility findings with respect to Ismond's testimony.

In its written closing arguments, the department agreed that there was no "direct evidence of actual harm to the environment." It argued, however, that the lack of evidence was attributable to petitioner's failure to monitor its wastewater. DEQ also argued that petitioner's violations posed more than a *de minimis* threat of harm to the environment because the failure to monitor and report wastewater discharges threatened the integrity of the state's permit system. DEQ argued that it needs the data contained in DMRs because, to make appropriate regulatory decisions, it needs "an accurate understanding of what pollutants are being discharged into Oregon waters."

The ALJ agreed with DEQ that petitioner's violations should be considered "moderate" rather than "minor." The ALJ reasoned as follows:

"In this case, [petitioner] failed to perform required monitoring for five years. Given the passage of time, it is simply not possible to determine if [petitioner's] activities had an adverse impact on the environment or if they posed more than a de minimis threat to human health or other environmental receptors at the time of the various discharges. While there is no evidence of *current* environmental harm to the Coquille River in the area near the facility, whether more significant harm occurred in the past is simply a matter of conjecture."

(Emphasis in original.)

The ALJ also noted that one of the factors for determining whether a violation is minor is "the concentration, volume, or toxicity of the materials involved." *See* OAR 340-012-0130(4) (listing factors). The ALJ then concluded that, "[b]ecause [petitioner] did not perform its required monitoring obligations, the precise concentration, volume,

and toxicity of the discharged wastewater can never be known."

The ALJ did, however, reduce the proposed penalty by several thousand dollars, to $200,266, because DEQ failed to present evidence that petitioner had obtained an "economic benefit" from one of its violations. The EQC affirmed the ALJ's conclusion in its entirety, including the determination that the magnitude of petitioner's violations was moderate.

When reviewing a final order to determine whether a particular finding is supported by substantial evidence, our task is to determine whether "the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c). Our standard of review requires that we defer to the agency's judgment "as to what inferences should be drawn from the evidence." *Tilden v. Board of Chiropractic Examiners*, 135 Or App 276, 281, 898 P2d 219 (1995). Furthermore, "[a]s part of our review for substantial evidence, we also review the board's order for substantial reason—that is, we determine whether the board provided a rational explanation of how its factual findings lead to the legal conclusions on which the order is based." *Arms v. SAIF*, 268 Or App 761, 767, 343 P3d 659 (2015). *See also Drew v. PSRB*, 322 Or 491, 500, 909 P2d 1211 (1996) (agencies "are required to demonstrate in their opinions the *reasoning* that leads the agency from the *facts* that it has found to the *conclusions* that it draws from those facts" (emphasis in original)).

Here, the EQC affirmed the ALJ's legal conclusion that petitioner failed to offer sufficient evidence to overcome the presumption that the proper magnitude classification for petitioner's violations is "moderate." As we understand it, the ALJ reached that conclusion for two reasons. First, the ALJ noted that determining the precise environmental impact in this case is complicated by the five-year duration of the violation. Second, the ALJ concluded that the river survey provided evidence that there was no "*current* environmental harm to the Coquille River," but shed no light on "whether more significant harm occurred in the past." (Emphasis in original.)

On judicial review, petitioner points out that it did submit evidence on the issue of past environmental harm. Ismond specifically testified that, more likely than not, the fish waste and wastewater that petitioner discharged into the river between 2004 and 2008 would have had no adverse affect on the environment during that period of time. Ismond's opinion was based partially on the results of the river survey. It was also, however, based on other factors, including Ismond's experience in the seafood industry and as a consultant for other seafood processing facilities, the relatively small amount of production occurring at the Bandon facility during the relevant time period, the type of waste being discharged, and the river's ability to quickly disperse discharged material into the ocean.

After considering the record, we agree with petitioner's characterization of the evidence that it submitted and conclude that the agency failed to provide substantial reason for its conclusion that petitioner's violations were moderate in magnitude. Under the applicable rule, petitioner does not have to prove the "precise concentration, volume, and toxicity of the discharged wastewater" in order to rebut the presumption of moderate magnitude. Rather, petitioner's burden is to demonstrate that a minor magnitude is "more probable than the presumed magnitude." OAR 340-012-0130(2). Petitioner submitted evidence that, if believed by the trier of fact, would satisfy that burden. Specifically, petitioner submitted corrected DMRs with estimates of how much seafood was processed each month, the results of the river survey, testimony about the characteristics of the river near the processing facility, and testimony about the type of waste that was discarded. The evidence also includes the opinion of an expert witness who specifically opined that "more than likely" petitioner's activities caused no environmental harm.

Although the rule requires the department to consider "all reasonably available information," which would include the evidence that petitioner put forward, it appears that the department and the ALJ focused entirely on the duration of the violation and petitioner's failure to report. Those are relevant factors, of course, but not the only factors. As to other factors, such as the toxicity of the material

that was discharged, petitioner offered evidence that went unrefuted. The department's order fails to offer a reasoned explanation of why, taking account of *"all* reasonably available information," petitioner failed to rebut the presumption of "moderate" magnitude. OAR 340-012-0130(4) (emphasis added).[6] Consequently, we reverse and remand for reconsideration.

Reversed and remanded for reconsideration.

---

[6] We do not mean to suggest that DEQ was necessarily required to submit evidence to rebut petitioner's evidence regarding the toxicity or likely harm caused by the discharge. The rule gives the department considerable latitude to determine whether, in light of "all reasonably available information," a petitioner has rebutted the presumption of "moderate" magnitude. But, where a petitioner does present affirmative evidence that a permit violation had little or no impact on the environment, and the department nevertheless deems the violation "moderate" rather than "minor," it is incumbent on the department to explain its reasons with reference to an accurate characterization of the information available to it.