Submitted May 31, 2016, affirmed September 20, 2017, petition for review denied February 15, 2018 (362 Or 508)

PHYLL MENDACINO,
*Petitioner,*

*v.*

BOARD OF PAROLE
AND POST-PRISON SUPERVISION,
*Respondent.*

Board of Parole and Post-Prison Supervision
A156752

404 P3d 1048

Peter Gartlan, Chief Defender, and Erik Blumenthal, Deputy Public Defender, Office of Public Defense Services, filed the brief for petitioner.

Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and Jeff J. Payne, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, and DeHoog, Judge, and Aoyagi, Judge.

## DEHOOG, J.

Petitioner, an inmate serving a life sentence for murder, seeks review of a 2013 final order issued by the Board of Parole and Post-Prison Supervision (the board). In its order, the board postponed petitioner's parole release date for 10 years after finding that he suffered from a "present severe emotional disturbance such as to constitute a danger to the health or safety of the community," ORS 144.125(3)(a), and that it was "not reasonable to expect that [petitioner] would be granted parole" before 2023, the new date set by the board, ORS 144.280(1)(b). Petitioner raises two assignments of error. First, he argues that substantial evidence does not support the board's order. Second, he contends that, because the board acted pursuant to statutes enacted after he committed his crime of conviction, the board's decision to postpone his parole for 10 years violated the state and federal constitutional prohibitions against *ex post facto* laws. We review the board's conclusions for legal error, as well as for substantial evidence and reason. *See Morrison v. Board of Parole*, 277 Or App 861, 863, 374 P3d 948, *rev den*, 360 Or 465 (2016); ORS 144.335(3) (providing that ORS 183.482(8) applies to parole board decisions). For the reasons discussed below, we conclude that the board did not err and, accordingly, affirm.

### BACKGROUND

In 1980, petitioner was convicted for a murder committed on November 3, 1977.[1] He was sentenced to life in prison and, as required by ORS 144.120,[2] the board set an initial parole release date. In 1997, shortly before petitioner's scheduled release on parole, the board conducted an "exit interview" under ORS 144.125 to review whether petitioner was suitable for release.[3] The board found that petitioner suffered from a

---

[1] Changes to Oregon's sentencing system became effective October 4, 1977. However, both before and after those changes, murder was punishable by life in prison, *see* ORS 163.115(5) (1977), subject to the possibility of parole following a minimum term.

[2] Unless otherwise noted, we refer to the current version of statutes when subsequent amendments do not affect our analysis.

[3] In part, ORS 144.125(1) authorizes the board to "interview the prisoner to review the prisoner's parole plan and psychiatric or psychological report, if any, and the record of the prisoner's conduct during confinement." If, in the course of its review, "the board finds the prisoner has a present severe emotional disturbance such as to constitute a danger to the health or safety of the community,

present severe emotional disturbance (PSED) "such as to constitute a danger to the health or safety of the community." ORS 144.125(3)(a). As a result, the board postponed petitioner's parole for two years and scheduled a new exit interview for 1999. In 1999, the board again postponed petitioner's parole for two years, as it did following hearings held every two years thereafter until 2013, when the board postponed petitioner's parole for 10 years rather than two years.

Petitioner's challenge arises from his 2013 exit interview. At that 2013 hearing, the board found, as it had at each of petitioner's previous parole review hearings, that he suffered from a PSED such as to constitute a danger to the health or safety of the community. In a "Board Action Form" (BAF), the board explained that, in making that finding, it was relying upon the reports of two psychologists who had examined petitioner:

> "Based on the doctors' reports and diagnos[e]s, coupled with all the information that the Board is considering, the Board concludes that the inmate suffers from a present severe emotional disturbance that constitutes a danger to the health or safety of the community. The Board has considered this matter under the substantive standard in effect at the time of the commitment offense(s) and all other applicable rules and laws."

Having once again found that petitioner suffered from a disqualifying PSED, the board deferred petitioner's parole, this time for 10 years, pursuant to ORS 144.125(3)(a), which provides, as to a parole deferral based on a PSED:

> "The board may not postpone a prisoner's scheduled release date to a date that is less than two years, or more than 10 years, from the date of the hearing * * *. The board shall determine the scheduled release date, and the prisoner may petition for interim review, in accordance with ORS 144.280."[4]

---

the board may order the postponement of the scheduled parole release until a specified future date." ORS 144.125(3)(a).

[4] In addition to a disqualifying PSED, ORS 144.125 authorizes the board to defer a parole release date on the separate grounds that a prisoner has "engaged in serious misconduct during confinement" or that the prisoner's "parole plan is inadequate." ORS 144.125(2), (4). The board may postpone an established parole date only for one of those three statutorily prescribed reasons. *Jones v. Board of Parole*, 283 Or App 650, 659, 391 P3d 831, *rev den*, 361 Or 543 (2017).

The cross-referenced statute, ORS 144.280, limits the board's authority to postpone parole for more than two years to inmates for whom the board has found that "it is not reasonable to expect that the prisoner would be granted parole before the date of the subsequent hearing." ORS 144.280(1)(b). The board is required to "determine the date of the subsequent hearing pursuant to rules adopted by the board." ORS 144.280(1)(c). The applicable board rules include OAR 255-062-0016, which lists 14 "Factors to be Considered in Establishing a Deferral Period Longer Than Two Years."

The BAF explained the board's finding "that it is not reasonable to expect that [petitioner] will be granted a firm release date before 10 years from the current projected release date." Specifically, that finding was

"based on, but not limited to the following factors in OAR 255-062-0016:

"(2)   Infractions of institutional rules and discipline:

"The Board found inmate had several disciplinary violations, with the most recent occurring in February 2012. The 2012 violation was concerning based on * * * inappropriate comments to staff, but more concerning was inmate's lack of understanding as to why he was held accountable for his behavior. Inmate did not take accountability for his actions, and demonstrated a disregard of the institution rules as well as [dis]respect for the female officer to whom he showed [a] rape-themed 'joke.'

"(5)   Inmate's demonstrated lack of effort to address criminal risk factors of psychological or emotional problems:

"The Board found inmate could not identify or adequately discuss psychological or emotional growth even though he has had the benefit of many years of programming. Inmate had made efforts to address alcoholism, but had not addressed other factors leading to criminality. Inmate maintained he was innocent not only of his crime of conviction, but of his disciplinary violations and previous crimes, and hiding behind this innocence, inmate appeared to only superficially engage in self-improvement.

"(9)   Inmate's inability to experience or demonstrate remorse or empathy:

"The Board did not find that inmate demonstrated remorse for his crime, as he maintained his innocence. Even taking his claim of innocence, inmate did not demonstrate remorse for the circumstances surrounding the death of the seven-year-old child. Inmate claimed to be the target of conspiracies, lies, and wrongdoing, and in so doing appeared to try to establish himself as the victim in this case. Inmate also failed to demonstrate remorse for his disciplinary rule violations, especially the 2012 violation. His lack of empathy for the staff person in that situation was also a serious concern.

"(10)   Demonstrated poor planning and foresight:

"The Board questioned inmate regarding his finances, and though he is receiving significant sums of money, he has saved nothing. He does not believe he needs to save because he has not had a firm release date. Such poor planning and judgment does not bode well for inmate's ability to handle life outside of prison.

"Each of these factors is an adequate and independent basis for our decision."

(Citations omitted.)

Petitioner timely sought administrative review of the board's decision. In relevant part, he argued that there was not substantial evidence to support the board's conclusion that he suffered from a PSED such as to constitute a danger to the health or safety of the community; that the board had not adequately explained the connection between the evidence and its conclusion; and that the board's application of 2009 statutory amendments constituted an *ex post facto* violation.

The board upheld its decision in an Administrative Review Response (ARR). The board explained to petitioner that it had "considered your entire record when it made its decision in your case, including the crime of murder of which you were convicted, your institutional record, the diagnoses and conclusions offered by the psychological examiners, and the information presented at your hearing." The ARR highlighted aspects of the psychologists' reports as follows:

"In his evaluation, Dr. Colistro reviewed your institutional history and previous psychological evaluations.

Dr. Colistro noted that in 2005 Dr. David Starr evaluated you and found that on the PCL-R (Psychopathy Checklist-Revised) you scored in the high category relative to the presence of psychopathy. Dr. Colistro also scored the PCL-R and found that you score in the moderate range as compared to other male inmates. He administered the Millon Clinical Multiaxial Inventory-II (MCMI-II), a psychological assessment tool intended to provide information on psycho-pathology, including specific personality disorders. The test portrayed you as 'an interpersonally threat-sensitive, inadequate, socially avoidant individual, who based on these test results alone, would be expected to have substantial difficulties establishing and maintaining interpersonal relations.'

"You placed in the low to moderate risk category on the HCR-20 (Historical, Clinical, Risk Management 20), an instrument for the assessment of violence risk. From the Board's perspective, a 'moderate' risk of future violence is extremely concerning in an inmate who has been convicted of the murder of a child. Dr. Colistro gave a diagnosis of, among other things, a 'Personality Disorder with Paranoid and Antisocial Traits.' He commented that your personality disorder was 'severe' in 2006, but in his opinion is now 'viewed as being partially in remission.'

"Dr. McGuffin utilized, among other tools, the MMPI-2 (Minnesota Multiphasic Personality Inventory) and the MCMI-III, empirically-validated standardized personality tests. Your MMPI-2 profile was valid with indicators that 'suggest moderate denial of common, ordinary faults and imperfections, as well as moderate overall defensiveness,' a pattern that 'suggests much tendency to minimize problems and a possible motivational distortion in an effort to present a positive image.' Individuals with profiles similar to yours 'exhibit significant difficulties arising from the presence of hostile and aggressive feelings,' are 'generally uncooperative and self-centered.' They tend to be 'very defensive, sensitive, and intolerant' and lack insight. The profile is characterized by a high level of antisocial and histrionic characteristics. Dr. McGuffin noted that on the MCMI-III you produced a profile of a person who is gloomy and pessimistic and has 'difficulty expressing anger and aggression in an appropriate manner.' Dr. McGuffin provided a diagnosis of 'Mixed Personality Disorder with Antisocial, and Paranoid Features.'"

The board then summarized various other concerns unrelated to the psychological reports. Of "particular concern" to the board was petitioner's continued denial that he had committed the murder and his belief that he had been unjustly convicted.[5] That, the board reasoned, indicated that petitioner had "not accepted responsibility for [his] crime, and therefore [has] not gained the self-knowledge that would operate to prevent [him] from killing again." The board explained that some of the factors that it had noted in the BAF "weighed heavily with the Board in [its] deliberations." Those factors included petitioner's failure to understand why he had been held accountable for the inappropriate "joke" that he had shared with a female corrections officer, his "inability to experience or demonstrate remorse or empathy," and his "demonstrated poor planning and foresight." The ARR summarized the board's conclusions as follows:

> "In sum, the Board did not find that credible evidence outweighed evidence that you have a present severe emotional disturbance such as to constitute a danger to the health or safety of the community, and concludes that there is substantial evidence in the record to support the Board's decision."

The board rejected petitioner's *ex post facto* argument, but did not specifically address the aspect of that argument that petitioner raises on judicial review.

## ANALYSIS

We turn to petitioner's assignments of error. We begin with petitioner's second assignment, in which he contends that the board's decision deferring his parole date for 10 years rather than two violated the *ex post facto* clauses of the Oregon and United States constitutions.[6] He argues that

---

[5] After petitioner was convicted of murder, based, in part, on evidence that he had confessed to the police, the Supreme Court reversed his conviction on the ground that his confession had been involuntary. *State v. Mendacino*, 288 Or 231, 238, 603 P2d 1376 (1979). At petitioner's retrial, a prison inmate testified that petitioner had confessed to him; petitioner denies having made that confession.

[6] Article I, section 21, of the Oregon Constitution provides, in part, "No *ex-post facto* law *** shall ever be passed[.]" Article I, section 10, of the United States Constitution provides, in part, "No state shall *** pass any *** *ex post facto* Law[.]"

ORS 144.280 and OAR 255-062-0016—on their face and as applied to him—are unconstitutional under those clauses, because they were enacted after the date of his offense and "expand the reasons available to the board to set the deferral period, as well as grant the board greater discretion in setting deferral periods."[7] The board disputes that characterization, and argues that those newly enacted provisions neither changed the substantive standard for deferring parole nor allowed for a lengthier deferral period.

"[A] person raising an *ex post facto* challenge to a change in parole procedure [under the Oregon Constitution or the United States Constitution] must demonstrate in a non-speculative way that the change has resulted in a significant risk that the person's punishment will be increased." *Morrison*, 277 Or App at 866 n 3 (citing *Smith v. Board of Parole*, 343 Or 410, 419-20, 171 P3d 354 (2007); *Butler v. Board of Parole*, 194 Or App 164, 171-73, 94 P3d 149, *rev den*, 337 Or 555 (2004)). When the change in law "does not by its own terms show a significant risk, the [petitioner] must demonstrate, by evidence drawn from the rule's practical implementation * * *[,] that as applied to [the petitioner's] own sentence the law created a significant risk of increasing his punishment." *Garner v. Jones*, 529 US 244, 255, 120 S Ct 1362, 146 L Ed 2d 236 (2000).

Before 2009, ORS 144.125(3)(a) did not dictate the allowable deferral period. It simply provided that, "[i]f the board finds the prisoner has a present severe emotional disturbance such as to constitute a danger to the health or safety of the community, the board may order the postponement of the scheduled parole release until a specified future date." The 2009 legislature specified that the board could defer release for between two and 10 years, subject to ORS 144.280 and its implementing rules.[8] *See* Or Laws

---

[7] The board argues that petitioner failed to exhaust the as-applied facet of his *ex post facto* argument. In parole cases, as in other administrative matters, a "party must present the particular challenges it intends to raise on judicial review first to the administrative body whose review must be exhausted." *Severy v. Board of Parole*, 274 Or App 330, 337, 360 P3d 682 (2015), *rev den*, 359 Or 667 (2016) (citing ORS 144.335(1)(b) (internal quotation marks omitted)). We conclude that petitioner fairly raised the issue to the board.

[8] Petitioner does not contend that the establishment of a minimum deferral period of two years renders ORS 144.125(3)(a) unconstitutional.

2009, ch 660, §§ 2-3. As we understand petitioner's *ex post facto* argument, he contends that, by dictating what the board must consider in exercising its discretion to choose a new release date, ORS 144.280 and OAR 255-062-0016 have "resulted in a significant risk that [petitioner's] punishment will be increased." *Morrison*, 277 Or App at 866 n 3. For the reasons that follow, we disagree that those provisions have the effect that petitioner posits.

We recently rejected an analogous claim involving the frequency of parole-consideration hearings for prisoners who were sentenced as dangerous offenders. *See id.* at 865-66. In the same bill that amended the exit-interview procedures at issue in this case, the 2009 legislature made identical changes regarding the timing of parole-consideration hearings for dangerous offenders. *See* Or Laws 2009, ch 660, § 4. As with exit interviews, the board must now schedule subsequent parole-consideration hearings between two and 10 years in the future, but may set the new hearing more than two years in the future only if it finds "that it is not reasonable to expect that the prisoner would be granted a release date before the date of the subsequent hearing." ORS 144.228(1)(b)(A), (B). And, as with prisoners serving life sentences, a dangerous offender may request an interim hearing, but only after "two years from the date of the previous hearing and at intervals of not less than two years thereafter." ORS 144.228(1)(c).

In *Morrison*, following a parole-consideration hearing, the board had declined to set a parole date for the petitioner and, relying on the 2009 changes in the law, scheduled his next hearing six years in the future. 277 Or App at 863. At the time of the petitioner's offense, however, a subsequent parole-consideration hearing could be set "no later than two years from the date of the previous hearing" and was subject to the offender's right to request an interim hearing. *Id.* at 863-64 (citing ORS 144.228(1)(b), (c) (1987), *amended by* Or Laws 1991, ch 318, § 2; Or Laws 1993, ch 334, § 3; Or Laws 2009, ch 660, § 4). The petitioner argued that, on their face and as applied to him, the amendments resulted in an *ex post facto* violation, because they deferred his next hearing for six years rather than two, and curtailed his

previously unlimited right to request an interim hearing to no more than every two years.

We concluded that the amendments to ORS 144.228 did not, on their face, create a risk of increased punishment. "[N]othing in them changes the substantive standard for determining whether a dangerous offender qualifies to have the board set a parole release date, or otherwise purports to extend the applicable term of incarceration for a dangerous offender." *Morrison*, 277 Or App at 866. And, as applied to the petitioner, we found it "speculative ([or even] affirmatively unlikely) that the change in procedure gave rise to any risk of increasing petitioner's term of incarceration." *Id.* at 867. That was because the board had found that it was not reasonable to expect that the petitioner would be granted a release date before the date of the subsequent hearing, and the record supported that finding. *Id.*[9]

Here, as in *Morrison*, the substantive standard governing parole deferrals has not changed. First, contrary to petitioner's apparent contention, OAR 255-062-0016 does not give the board additional reasons to defer parole. The factors listed under that rule guide the board's decision as to *when* to set the next exit interview; they do not change the substantive standard for *whether* to release the inmate or to defer parole. As relevant here, the decision to postpone parole remains subject to the requirement that the board first find that the prisoner "has a present severe emotional disturbance such as to constitute a danger to the health or safety of the community." ORS 144.125(3)(a). Only then does the board turn to ORS 144.280 and OAR 255-062-0016 to determine the appropriate length of deferral.

Second, neither ORS 144.280 nor OAR 255-062-0016 grants the board authority to defer petitioner's parole for longer than it could at the time of his offense. In fact, whereas the board's current authority to defer parole is capped at 10 years and subject to potential interim review every two years, at the time of petitioner's offense, the

_____
[9] In making that determination, the board in *Morrison* applied OAR 255-062-0016, the same administrative rule that the board applied in this case to determine that it was not reasonable to expect that petitioner would be granted a firm release date within 10 years of his last exit interview. 277 Or App at 864-65.

board had complete discretion as to when the next hearing would be set, *see* ORS 144.125(3) (1977) (requiring only that the board set a hearing for a "specified future date"), and inmates were allowed review only "after four years have elapsed since the first board hearing and every three years thereafter." *Former* OAR 254-040-0005 (Oct 4, 1977). Thus, the 2009 changes in the law do not create a significant risk that petitioner's punishment will be increased. *See also Garner*, 529 US at 254 (rejecting facial *ex post facto* challenge to Georgia law that increased the time between parole hearings from three to eight years if it was "not reasonable to expect that parole would be granted during the intervening years" and allowed for interim review based on new information or changed circumstances).

Petitioner's as-applied *ex post facto* argument fairs no better. As in *Morrison*, the board in this case found that it was "not reasonable to expect" that petitioner would be released before the subsequent hearing. Furthermore, petitioner remains able to request, every two years until the scheduled hearing, that the board hold an interim hearing to consider his release. If, based upon such a request, the board finds "that there is reasonable cause to believe that [petitioner] may be granted parole," then the board must conduct a hearing "as soon as is reasonably convenient." ORS 144.280(2). And, if petitioner has reason to believe that a request for an interim hearing has been wrongly denied, he may seek judicial review of that decision. *See* ORS 144.280(3) (requiring board to memorialize denial of a petition for interim hearing by issuing a final order); ORS 144.335(1)(a) (allowing a prisoner to "seek judicial review of a final order of the board" if the prisoner is "adversely affected or aggrieved" by the order). Although petitioner will not automatically receive a hearing every two years, he has not demonstrated a significant risk, either facially or as applied to himself, that the 2009 amendments will increase his period of incarceration. We conclude, therefore, that the board's reliance on those provisions in deferring petitioner's parole did not constitute an *ex post facto* violation.

We now turn to petitioner's remaining assignment of error, in which he argues that the board's finding of a

PSED is not supported by substantial evidence.[10] Under ORS 183.482(8)(c), we must "set aside or remand the order" if we conclude that it is not supported by substantial evidence. Substantial evidence "exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." *Id.*; *see* ORS 144.335(3) (providing that we "may affirm, reverse or remand the order on the same basis as provided in ORS 183.482(8)").

Petitioner's first contention is that substantial evidence does not exist to support the board's order, because the board relied extensively on the psychologists' written reports, which are hearsay. Petitioner asserts that *Reguero v. Teacher Standards and Practices*, 312 Or 402, 418-19, 822 P2d 1171 (1991), supports that argument, but we disagree. *Reguero* instructs us to consider case-specific, nonexclusive factors to determine whether substantial evidence supports an agency's findings when those findings rely, in part, on hearsay. *Reguero* does not, however, hold "that a hearsay written report can never rise to the level of substantial evidence." *Smith v. Board of Parole*, 284 Or App 226, 231, 391 P3d 807 (2017). And, for exit interviews conducted under ORS 144.125, the relevant statutes expressly contemplate that the board will typically base its decisions more on written reports than live testimony. *See* ORS 144.125(1) (before releasing an inmate on parole, the board may "interview the prisoner to review the prisoner's parole plan and psychiatric or psychological report, if any, and the record of the prisoner's conduct during confinement"); ORS 144.185(3) (before making its final decision, the board may obtain "current records and information regarding the prisoner, including * * * [t]he reports of any physical, mental and psychiatric examinations of the prisoner"). Moreover, the board obtained and reviewed the psychologists' reports in the exact manner authorized by statute. *See* ORS 144.223 (permitting board to

---

[10] Petitioner also argues that the board lacked substantial evidence to find that it is not reasonable to expect that he would be granted release before the next scheduled hearing. *See* ORS 144.280(1)(b). But petitioner did not raise that argument to the board. Although the BAF discussed in detail the OAR 255-062-0016 factors that the board relied upon in setting a 10-year deferral term, petitioner's request for administrative review challenged the PSED finding rather than the length of the deferral. Accordingly, the board had no occasion to consider the argument that petitioner now makes to us, leaving that argument unpreserved.

require a prisoner to undergo a psychological or psychiatric examination, after which the examining doctor must "file a written report of the findings and conclusions," which must be provided to the board, the prisoner, and the prisoner's attorney). In light of those provisions, petitioner's substantial evidence challenge must rest on the content of the psychologists' reports and the other evidence presented at the hearing, not on the fact that the reports are hearsay.[11]

We turn, then, to whether the record as a whole provides substantial evidence to support the board's finding that petitioner suffers from a PSED such as to constitute a danger to the health or safety of the community. The thrust of petitioner's argument is that the board erred in failing to account for evidence that weighed against that finding. Although couched primarily as a substantial-evidence argument, we understand petitioner's contention to go beyond an assertion that a reasonable person could not make the same finding as the board, and to encompass a substantial-reason argument as well. That is, petitioner argues that the board's failure to acknowledge certain countervailing evidence or to explain its finding in terms of the whole record deprived its decision of substantial reason. We consider each contention in turn.

When evaluating whether substantial evidence supports an agency's finding, we ask whether "the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c). We consider both the evidence that supports and detracts from the board's findings, *see Castro v. Board of Parole*, 232 Or App 75, 83, 220 P3d 772 (2009), but defer to the board's reasonable inferences without reweighing the evidence in the record ourselves, *see Bandon Pacific v. Environmental Quality Commission*, 273 Or App 355, 362, 359 P3d 394 (2015).

Viewing the record in that light, we conclude that it would permit a reasonable person to make the finding that the board made regarding petitioner's PSED. That finding comprises four elements: (1) an emotional disorder that is (2) present, (3) severe, and (4) such that petitioner is a danger

---

[11] We note that, at his exit interview, petitioner acknowledged having read the psychologists' reports and expressed no concerns regarding their factual content.

to the health or safety of the community. *See* ORS 144.125(3); *Edwards v. Board of Parole*, 272 Or App 183, 190, 355 P3d 166, *rev den*, 358 Or 70 (2015). The PSED assessment under ORS 144.125(3) presents a legal—rather than medical—standard for the board to apply, but a formal diagnosis "must provide the foundation for the Board's finding that the emotional disturbance in question is 'present' and 'severe.'" *Christenson v. Thompson*, 176 Or App 54, 61, 31 P3d 449 (2001). Here, both psychologists provided formal diagnoses, each concluding that petitioner exhibited a "personality disorder" or "mixed personality disorder," with paranoid and antisocial traits. And, in finding that petitioner suffered from an emotional disorder, the board expressly considered the summaries of assessments and tests provided by those psychologists, each of whom explained that petitioner's psychological profile suggested significant difficulties with interpersonal relations, defensiveness, and sensitivity. Based upon that evidence, a reasonable person could find that petitioner presently suffers from an emotional disorder.

The board's evidence was more equivocal as to whether petitioner's disorder was "severe" and "such as to constitute a danger to the health or safety of the community." We have not previously defined the term "severe," but we understand it to require more than the mere diagnosis of an emotional disorder. *See Meadows v. Schiedler*, 143 Or App 213, 220, 924 P2d 314 (1996) (concluding that an amendment removing the term "severe" from ORS 144.125(3) constituted an *ex post facto* law, because it enabled the board "to postpone release on a less restrictive showing than the previous version authorized"). Petitioner emphasizes evidence that, in his view, precluded the board's finding because it was in conflict with other evidence that supported the finding. For example, there was evidence that petitioner had participated in prison programming and therapy and that he had benefitted from those efforts. Petitioner notes that both psychologists recognized that he "had made great strides in his rehabilitation," and that Colistro specifically concluded that he was "amenable to management and supervision in the community." Colistro also described petitioner's disorder as partially in remission and opined that petitioner indicated "an awareness * * * of his own risk profile" and that,

notwithstanding his disciplinary violation the year before, petitioner had become less confrontational and more "program compliant." And, although petitioner maintained his innocence—a matter that the board found demonstrated a lack of effort to address criminal risk factors and a lack of remorse for his crime—he acknowledged to the psychologists and to the board that his unacceptable drinking behavior had at least indirectly led to the murder of a young child. Finally, the record showed that, in addition to petitioner's successful participation in therapy and treatment programs, he had also earned two bachelor's degrees while in prison and was active in the Native American prisoner community.

We are not persuaded, however, that that countervailing evidence rendered the record insufficient to support the finding that petitioner's disorder both is severe and constitutes a danger to the health or safety of the community. Although, like Colistro, McGuffin acknowledged petitioner's progress, he emphasized petitioner's significant paranoia and sense of persecution. In McGuffin's opinion, petitioner's 2012 disciplinary violation, in which he had shared the rape "joke" with a female corrections officer, showed a "loss of control, poor judgment, a need to feel power, a disregard for the rights of others and possibly a need to instill fear." Cf. *Peek v. Thompson*, 160 Or App 260, 267, 980 P2d 178, *rev dismissed*, 329 Or 553 (1999) (noting that the board on remand could find a PSED from a psychological report that stated, in part, that the prisoner had difficulties "control[ling] emotional discharges" and "tend[ed] to misinterpret his perceptions and to act inappropriately, in part because of excessive negativism and anger"). McGuffin found that incident particularly concerning because it had occurred "in the highly structured environment of prison and was not precipitated by abusing alcohol or any illicit substances," as were petitioner's crimes. As noted, the board also found that petitioner was unable to demonstrate remorse and empathy, a finding that, given petitioner's claim of innocence not only for the murder but for previous crimes and his disciplinary violations, the record supported.

Thus, contrary to petitioner's contention, the board did not unduly rely "on what it believed to be petitioner's

false claim of innocence and the facts of his crimes." And, to the extent that petitioner argues that the board could not have made the finding that it did because the two psychologists' reports were in conflict, we disagree. As long as a reasonable person could have found that, despite differences between Colistro's and McGuffin's reports, petitioner's emotional disorder was severe and constituted a danger to the community, the board was permitted to resolve that conflict in the same manner. We conclude that a reasonable person could do so here. Accordingly, there was substantial evidence to support the board's finding.

Finally, we consider petitioner's contention that the board's order fails to demonstrate substantial reason. Although we have already concluded that a reasonable person could make the findings that the board relied on, we must also ensure that the board's order provides "'some kind of an explanation connecting the facts of the case (which would include the facts found, if any) and the result reached.'" *Jenkins v. Board of Parole*, 356 Or 186, 200, 335 P3d 828 (2014) (quoting *Martin v. Board of Parole*, 327 Or 147, 157, 957 P2d 1210 (1998)). If the board's reasoning is not obvious, its order—which includes both the BAF and the ARR—must at least set forth the bases for its inferences. The board's explanation "'need not be complex, but it should be sufficient to demonstrate the existence of a rational basis and to allow for judicial review.'" *Id.* at 196 (quoting *City of Roseburg v. Roseburg City Firefighters*, 292 Or 266, 272, 639 P2d 90 (1981)). There must be "no indication that, in making its decision, the board relied on evidence that did not qualify as substantial evidence." *Id.* at 208 (citing *Martin*, 327 Or at 157-58). Unlike most agencies, however, the board is not generally required to make written findings of fact and conclusions of law. *See id.* at 196 (citing ORS 183.315(1), which exempts the board from the findings-and-conclusions requirement in ORS 183.470(2)).[12]

---

[12] We note that the legislature included a specific findings-and-conclusions requirement when it enacted ORS 144.280(3), which applies "[w]hen the board grants a prisoner a hearing that is more than two years from the date parole is denied and when the board denies a petition for an interim hearing[.]" Here, neither party has suggested that that provision has any bearing on the outcome of our review.

Here, petitioner argues that the board's order relied too heavily on the "unchangeable circumstance" of his historical behaviors, including the murder itself, without accounting for the evidence that weighed against its decision other than to state that it had considered "all of the evidence presented at [the] hearing." He also argues that the board failed to explain its conclusion that his claim of innocence made him likely to reoffend. We disagree, however, that the board's order was so conclusory. The board explicitly reasoned that petitioner had "not accepted responsibility for [his] crime, and therefore [had] not gained the self-knowledge that would operate to prevent [him] from killing again." That reasoning appears in the order after the board's summary of the psychologists' reports, which indicate that persons with petitioner's psychological profile tend to minimize their own faults, lack insight, and exhibit defensiveness. The board's discussion of petitioner's claim of innocence also precedes the board's expression of concern regarding petitioner's inability to experience or demonstrate remorse or empathy. In that context, the board's reasoning is readily apparent.

We also conclude that the order adequately explains the connection between "the facts of the case * * * and the result reached," *Jenkins*, 356 Or at 200, even though the board did not overtly address the countervailing evidence. The Supreme Court's decision in *Jenkins* informs that conclusion. In *Jenkins*, the court concluded that a rather conclusory order demonstrated substantial reason, even though the board had done little more than state, based on a psychological report that the board never described, that the petitioner had a PSED such as to constitute a danger to the community. 356 Or at 190. Notably, the petitioner in that case did not contend that the report could not, with sufficient explanation, adequately support the board's decision. *Id.* at 208. But, under those circumstances, at least, the court concluded that there was "little doubt as to the facts on which [the board] relied or the existence of a rational connection between those facts and its decision." *Id.*; *see also Martin*, 327 Or at 159 (approving the board's conclusory order that imposed a special condition of parole, where "no one reasonably could doubt" the importance of the condition and the

order "indicate[d] that it weighed the different interests of the parties").

Here, the record is more mixed than in *Jenkins*, where the only report before the board was unequivocal and supported the board's decision. However, the board's order is considerably more detailed here than in *Jenkins*. And, although a more complete explanation of how the board resolved conflicts in the evidence might aid our review, the legislature has chosen to exempt the board from any requirement to provide such an explanation. ORS 183.315(1) (exempting board from findings-and-conclusions requirement applicable to other agencies under ORS 183.470(2)). Under the circumstances of this case, which include the board's express consideration of both of the psychologists' reports, we conclude that the board's order adequately reflects the evidence on which it relied and explains the connection between that evidence and the board's resulting decision.

Affirmed.