Argued and submitted September 29, affirmed October 27, 2021

# UNITED ACADEMICS OF OREGON STATE UNIVERSITY,
*Respondent,*

*v.*

# OREGON STATE UNIVERSITY,
*Petitioner.*

### Employment Relations Board
### UP02118; A174198

502 P3d 254

Petitioner seeks judicial review of a final order of the Employment Relations Board (ERB), which determined that petitioner attempted to influence faculty members' decisions regarding union representation in violation of ORS 243.670(2)(a) and ORS 243.672(1)(i). Petitioner argues that its conduct does not fall within the category of conduct precluded by ORS 243.670(2)(a), and that the ERB does not support its findings with substantial reason. In the alternative, petitioner and its *amici* argue that petitioner's conduct is shielded from liability by an exception provided in ORS 243.670(3). *Held*: The ERB's interpretation of ORS 243.670(2)(a) was not erroneous and its inferences, based on stipulated historical facts, were reasoned and reasonable. Petitioner's conduct did not fall within the narrow exception provided by ORS 243.670(3).

Affirmed.

Jeffrey P. Chicoine argued the cause for petitioner. Also on the opening brief was Miller Nash Graham & Dunn LLP. Also on the reply brief were Ivan Resendiz Gutierrez and Miller Nash Graham & Dunn LLP.

Jason M. Weyand argued the cause for respondent. Also on the brief was Tedesco Law Group.

Kyle T. Abraham, Trevor R. Caldwell, Natalie M. Pattison, and Barran Liebman LLP filed the brief *amicus curiae* for Oregon Public Employer Labor Relations Association.

Liani J. Reeves, John M. Stellwagen, and Bullard Law filed the brief *amicus curiae* for The Oregon Public Universities.

Noah T. Barish, McKanna Bishop Joffe, LLP, Risa Lieberwitz, Washington, D.C., Aaron Nisenson, Washington,

D. C., and Nancy Long, Washington, D. C., filed the brief *amicus curiae* for American Association of University Professors and Oregon Higher Education Faculty Associations.

Noah T. Barish, Caleb D. Mammen, McKanna Bishop Joffe, LLP, Lane Toensmeier, Danielle Holmes, and Tedesco Law Group filed the brief *amicus curiae* for Labor Coalition.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

LAGESEN, P. J.

Affirmed.

**LAGESEN, P. J.**

Oregon State University (OSU) petitions for judicial review of a final order of the Employment Relations Board (ERB). In that order, the ERB determined that OSU attempted to influence faculty members' decisions regarding whether to support union representation by United Academics of Oregon State University (union) in violation of ORS 243.670(2)(a) and ORS 243.672(1)(i). That determination was based on its findings that OSU solicited questions and created, maintained, and distributed information through a "Frequently Asked Questions" (FAQ) webpage during the organization campaign in an effort to deter union organizing. Seeing no error, we affirm.

The historical facts are not disputed. The public phase of a union organizing drive orchestrated by the union began in 2017, culminating in a petition to certify a new bargaining unit of OSU faculty employees in June 2018. In response to the organizing drive, OSU administrators created a webpage to distribute information to faculty members. The webpage contained a list of questions described as "frequently asked questions," or FAQs.

OSU used the university email system to notify faculty of the new webpage, providing a link to the page with those initial FAQs through a series of emails. The first email was sent by Senior Vice Provost for Faculty Affairs, Capalbo. In addition to a link to the FAQ webpage, the first email provided a link for employees to submit their own questions to OSU relating to the organizing drive. Provost and Executive Vice President, Feser, began sending emails with similar content eight months later.

The FAQ webpage was accessible through the OSU intranet, could be viewed by any OSU employee with a university-issued login, and also could be reached by clicking on a link in the emails sent by university administrators, Capalbo and Feser. Once at the FAQ webpage, employees could review the list of questions, then click on a question to reveal the answer provided by OSU. The webpage also included a link for employees to submit their own questions. Any OSU employee was able to submit questions for

consideration and posting as an FAQ, including supervisory or managerial employees.

The initial set of 27 FAQs—both the questions and answers—were drafted by OSU. Those initial FAQs did not respond to specific questions received by OSU from faculty members, and remained unchanged until March 22, 2018, the day Feser sent his first email. At that time, additional questions and answers were added. Feser's email informed employees that "Oregon law allows public employers to respond to questions they receive from employees during a union organizing drive" and that the FAQ webpage was created "to provide responses *to such questions*." (Emphasis added.)

Although the character of the FAQs varied, several, both from the original 27 drafted by OSU and those that came after, raise topics commonly used in the context of anti-union materials, including strikes and union dues. Some of the original FAQs drafted by OSU highlighted potential consequences of unionization, including the possibility of fair share fees and faculty benefits being subject to bargaining, to explain "what the success of a unionization effort might mean at OSU." In some instances, OSU edited submitted questions before publishing them.

Capalbo's email did not inform faculty that OSU had generated the initial 27 questions and answers. None of Feser's emails informed faculty that many of the remainder of the questions published on the FAQ webpage had been edited or changed from the questions actually submitted by employees. Some of the textual changes were minor grammatical or stylistic changes. Some questions were edited to omit the opinions expressed by the employee. Several questions received answers that exceeded the scope of the posted question, including giving advice on how to revoke submitted authorization cards after submitting them to the union.

On June 16, 2018, the union's legal counsel contacted the Director of Labor Relations Services for the University Shared Services Enterprise (USSE) with concerns about OSU's FAQs. The resulting exchange produced substantial information about how each question was received and if

and how the university edited each question. Specifically, as noted, the original 27 questions and answers were drafted by OSU. Later additions were derived primarily from anonymous submissions through the online form on the FAQ webpage with some coming directly from named faculty. Four submissions were designated by OSU as received by "other" means. Three of the FAQs labeled by OSU as "other" were prompted not by submitted questions, but by a Corvallis Gazette-Times news article written by Bennett Hall, *Getting Organized: OSU Faculty Members Take Steps to Form a Union*, May 20, 2018, which primarily raised the topic of how union organizing impacted OSU's shared governance structure.

The final FAQ submitted as "other" was inspired by a request from a faculty member, who opposed the union, to use the school's distribution lists to send information to faculty. After his request was denied by Feser's special assistant, the following FAQ was added to the webpage:

"How do I contact my fellow colleagues without using the faculty Listserv?

"You can make a Public Records Request seeking the public email addresses for all faculty. Email [OSU Office of General Counsel] your public records request. Once received, you can use that list to create your own email distribution list. Please keep in mind your obligations under the Acceptable Use of University Computing Resources Policy[.]"

After obtaining that information about the FAQs from the USSE employee, the union initiated this unfair-labor-practice proceeding before the ERB, alleging that OSU violated ORS 243.672(1)(i) when it solicited questions from employees about union organizing and created, maintained, and distributed information through its FAQ webpage while OSU faculty were in the process of deciding whether to unionize. ORS 243.672(1)(i) makes it an unfair labor practice to violate ORS 243.670(2). ORS 243.670(2)(a) provides, in relevant part, that a public employer may not "[u]se public funds to support actions to assist, promote or deter union organizing[.]" ORS 243.670 and ORS 243.672(1)(i) were added to the Public Employee Collective Bargaining Act in 2013, when the legislature enacted the Public Employer

Accountability Act through House Bill (HB) 3342 (2013). *See* Or Laws 2013, ch 663, § 4.

The parties filed joint exhibits and joint stipulated facts, and both stipulated to $1 of public funds being used by OSU for the challenged conduct. Those stipulations establish that the ERB's findings of historical fact, which are based on the joint exhibits and joint stipulated facts, are undisputed. Nor is the allegation that OSU used public funds for the conduct at issue disputed.

Based on the entirety of the record, the ERB found that OSU used its FAQ webpage to subtly influence the campus debate on whether its employees should support or oppose union organizing and that, in some instances, OSU actively participated in that debate. The ERB held these findings to be sufficient to conclude that OSU tried to influence the decision of its employees regarding whether those employees should support or oppose the union, thereby violating ORS 243.670(2)(a) and, thus, ORS 243.672(1)(i). The ERB rejected OSU's contention that its conduct was shielded by ORS 243.670(3), which permits an employer to respond to inquiries from employees.

OSU petitioned us for judicial review. As we understand its arguments on review, OSU contends that, in concluding that its conduct violated ORS 243.670, the ERB misconstrued provisions of the statute. ORS 183.482(8)(a). OSU also contends that the ERB's inferences and ultimate legal conclusions are not reasonable ones, such that the board's order is not supported by substantial evidence and substantial reason. ORS 183.482(8)(c); *Jenkins v. Board of Parole*, 356 Or 186, 195-96, 335 P3d 828 (2014) (explaining the substantial-reason requirement that is implicit in substantial-evidence standard). The union responds that the ERB's order is correct in all respects.

At issue in this case is the correctness of the ERB's determination that OSU violated ORS 243.670(2). It provides, in relevant part:

"A public employer may not:

"(a)  Use public funds to support actions to assist, promote or deter union organizing[.]"

ORS 243.670(1)(a) provides the following relevant definition:

"'Assist, promote or deter union organizing' means any attempt by a public employer to influence the decision of any or all of its employees or the employees of its subcontractors regarding:

"(A)  Whether to support or oppose a labor organization that represents or seeks to represent those employees; or

"(B)  Whether to become a member of any labor organization."

The board ultimately interpreted that text to prohibit "any act or instance of a public employer making an effort to affect or alter (including by indirect or intangible means) the decision of any or all of its employees regarding whether to support or oppose a labor organization that seeks to represent those employees."

We start by noting that, to the extent OSU argues that the board's determination rests on an erroneous interpretation of ORS 243.670(2), OSU does not seem to disagree with the board's articulated interpretation, as far as it goes. Instead, OSU appears only to be contesting whether that interpretation encompasses OSU's specific conduct. While OSU does not concede that it was intending to influence union organization, it relies heavily on legislative history to argue that the statute prohibits only conduct that can be understood to be "taking a public stand and actively opposing union organizing[.]" Rather than engaging with the plain text of the statute, OSU relies on select statements made before Senate and House committees by the original sponsor of the bill, Representative Dembrow, to argue that HB 3342, as codified in ORS 243.670, was only intended to bar "big budget anti-union campaigns and compel public employer neutrality."

OSU's proposed interpretation of the statute is not persuasive because it conflicts with the plain words used by the legislature. ORS 243.670(1)(a) defines the prohibited conduct as "*any* attempt by a public employer to influence the decision of any or all of its employees * * *." (Emphasis added.) No analysis of the legislative history can undercut the fact

that the legislature wrote the statute broadly to encompass "any" attempt to influence the decisions of employees with regard to union organizing, and did not include the limitations that OSU's argument asks us to recognize. *See, e.g.*, *Sherman v. Dept. of Human Services*, 368 Or 403, 418, 492 P3d 31 (2021) (declining to read limitation into a statute that the text did not include on the basis of legislative history); *State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009) ("[A] party seeking to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it.").

We turn to OSU's assertion that the ERB's determination that OSU violated ORS 243.670 is not supported by substantial evidence and substantial reason. Evaluating a challenge to a board's ruling for substantial evidence requires us to determine whether the record, taken as a whole, would permit a reasonable person to make the disputed finding. *Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990). When a finding hinges on an inference, we ask whether the record allows the conclusion that "there is a basis in reason" for the inferred fact:

> "The substantial evidence rule is not entirely dispositive in reviewing findings which embody inferences. An inference has two parts: a primary fact plus a deduction. The evidence directly establishes only the truth of the primary fact or facts from which an inference may be derived therefrom. Rational bases may exist for more than one inference to be drawn from the same primary fact, and the factfinder (*i.e.*, the agency) has the task to decide which one to draw. The court does not substitute its judgment as to which inference should be drawn, but it must review for the existence of a rationale. The rationale is reviewed for soundness, not for conformity to judicial preference. Judicial review of an inference is thus in two stages: (1) whether the basic fact or facts are supported by substantial evidence, and (2) whether there is a basis in reason connecting the inference to the facts from which it is derived."

*City of Roseburg v. Roseburg City Firefighters*, 292 Or 266, 271, 639 P2d 90 (1981).

Similarly, whether an agency's ultimate conclusions from its findings of fact are supported by substantial reason

turns on whether the agency's order supplies a "rational connection between the facts and the legal conclusions it draws from them" such that the conclusions are sufficiently reviewable by an appellate court. *Jenkins*, 356 Or at 195-96. Confronted with a substantial-reason challenge, our review is simply to determine whether the order supplies the necessary reasoning.

Starting with the issue of substantial evidence, we do not understand OSU to argue that the ERB's findings of historical fact are not supported by substantial evidence. Those facts were pulled either directly from the joint stipulated facts or from the jointly submitted exhibits, and OSU has not pointed to any particular historical finding that it views as incorrect.

Rather, OSU's main contention appears to be that it cannot be reasonably inferred from the historical facts found by the ERB that OSU's conduct surrounding the FAQ webpage amounted to an effort to affect or influence its employees' decision about organizing.

First, OSU asserts that the ERB "cherry-picked" from the record to support its conclusion, implying that a review of the whole record would not allow for the determination that the ERB reached. While the ERB's order does not quote the entirety of the record, it belies OSU's implication that the ERB did not consider the record in its entirety and only chose facts that supported its ultimate conclusion. In fact, the order expressly acknowledges examples of OSU conduct that do not directly support the finding of a violation, but explains that the examples did not persuade the ERB to disregard the facts that point toward the inference that OSU was attempting to influence its employees' decision. Regardless, a substantial reason argument alleging insufficient reference to the record or consideration of the evidence (or "cherry-picking") misconstrues the standard as laid out in *Jenkins*, which does not require a complete recounting of all evidence. *See, e.g.*, *Mendacino v. Board of Parole*, 287 Or App 822, 838, 404 P3d 1048 (2017), *rev den*, 362 Or 508 (2018) (citing *Jenkins*, 356 Or at 200, to explain that an order may adequately explain its conclusion even without overtly addressing countervailing evidence).

Second, OSU argues that the record does not allow for the conclusion that its actions exceeded the requirements of neutrality imposed by ORS 243.670 or that OSU had the intention of influencing its employees with regard to union organization. In other words, while OSU does not dispute the ERB's findings about its historical conduct, it disputes what inferences can (and should) be drawn from it and contends that the ERB has not sufficiently justified the inferences it drew with reasoning.

That argument is refuted by the order itself, which contains a detailed and reasonable explanation of its inferences, making numerous references to the joint stipulated facts and exhibits. While it may be possible to draw *different* inferences from the evidence, that does not mean that the inferences drawn by the ERB were unreasonable, and we are not empowered under our standard of review to displace reasonable—and reasoned—inferences drawn by the agency. *See Roseburg*, 292 Or at 271 ("[T]he court will not substitute its judgment for that of the agency in drawing an inference, but the court must be satisfied that agency judgment has actually been exercised."). For example, it may be reasonable to interpret the discrepancy between OSU telling faculty the FAQs were a result of questions asked by employees on the one hand, and many of the FAQs actually being generated by the administration directly on the other as benign; however, it is not *unreasonable* to infer that this repeated discrepancy in OSU's conduct points to an intention to manipulate the conversation between administration and faculty, particularly when considered in the context of OSU's other conduct. Also, while evidence of how OSU edited questions and framed its answers may permit the inference that management of the FAQs was simply inconsistent, it is also *reasonable* to infer, as the ERB did, that, based on the edits made and answers given, OSU was aiming to subtly cast union organizing in a negative light. Finally, while it may be reasonable to interpret OSU's occasional provision of information in excess of the scope of the question asked as neutral, it also is not *unreasonable* to consider the nature of the advice given, and infer an attempt to assist employees in opposing union organizing.

We turn to OSU's final argument. Although OSU did not fully develop this argument in its opening brief, we address it because *amici* have raised the point and because it is easily resolved on this record. The argument is that ORS 243.670(3) shields OSU from liability under ORS 243.670(2), even if OSU was attempting to influence its employees' decisions about organizing. That provision states, "*If* an employee requests the opinion of the employee's employer or supervisor about union organizing, nothing in this section prohibits the employer or supervisor from responding to the request of the employee." (Emphasis added.) Although OSU argues that the provision shows that the legislature intended to grant public employers broad authority to address employee questions, the provision by its terms is narrow. It states simply that, if an employee asks for an opinion on organizing, an employer or supervisor can respond. It does not say that an employer can engage in the conduct that OSU was found to have engaged in here: actively soliciting such requests from employees, writing questions of its own and then distributing answers, modifying and then publishing questions it receives, crafting answers that go beyond the scope of a question, and maintaining those questions and answers on a webpage accessible to all employees with a login—all while using public funds to do so. In other words, as a factual matter, OSU's conduct went far beyond supplying an opinion in response to requests by individual employees. The ERB correctly concluded that ORS 243.670(3) did not immunize OSU from liability under ORS 243.670(2).

We briefly address the points made in the multiple *amicus curiae* briefs submitted to us. *Amici* expand on competing policy arguments provided by the parties as to why the ERB's decision should or should not be upheld. Both sides contemplate the impact the ERB's interpretation and application of ORS 243.670 will have on traditions of academic freedom and statutorily mandated shared governance. They, in essence, suggest that we should interpret and apply ORS 243.670 in a way that takes into account the unique setting of higher education. But ORS 243.670 is a statute that governs all public employers, and nothing in its text suggests that the legislature intended the particular nature of a public employer to bear on the meaning or

application of the statute. If the legislature had intended to take into account special considerations related to university governance, it would have drafted specific provisions addressing the application in the context of a college or university, as it has done elsewhere in the Public Employees Collective Bargaining Act. *See, e.g.*, *Oregon Tech AAUP v. Oregon Institute of Technology*, 314 Or App 595, 604, 500 P3d 55 (2021) (holding that university department heads are not excluded from the right to unionize because they do not fall under "supervisory employee" as defined in ORS 243.650(23)(b)). To the extent that ORS 243.670, as drafted, gives rise to unique challenges within the setting of institutions of higher education, those challenges are ones for the legislature to address through legislation.

Affirmed.